UNITED STATES of America,
Plaintiff,

v.

Lorenzo MUÑOZ FRANCO,
et al., Defendants.

Criminal No. 95–386(DRD).

United States District Court,
D. Puerto Rico.

Jan. 28, 2005.

Desiree Laborde–Sanfiorenzo, Maria Dominguez–Victoriano, Nereida Melendez–Rivera and Sonia I. Torres–Pabon, United States Attorney's Office, San Juan, PR, for Plaintiff.

Andres Guillemard–Noble, Nachman & Guillemard, Harry Anduze–Montano, Harry Anduze Montano Law Office, Jorge L. Arroyo–Alejandro, Jorge L. Arroyo Law. Office, San Juan, PR, R.J. Cinquegrana, Choate, Hall & Stewart, Boston, MA, for Defendants.

Manuel A. Pietrantoni, Fiddler, Gonzalez & Rodriguez, Xiomara I. Cebollero–Davila, Fernandez, Collins & Rivero Vergne, San Juan, PR, for Intervenor.

Kevin G. Little, Kevin G. Little Law Office, for Interested Party.

## OPINION AN ORDER AS TO BAIL PENDING APPEAL

DOMINGUEZ, District Judge.

Pending before the Court is a plethora of motions filed by all four co-defendants seeking bail pending appeal under 18 U.S.C. 3143(b).

## I. FACTUAL AND PROCEDURAL BACKGROUND

In this case, two bank officers of Caguas Central Federal Savings and Loan, a federal guaranteed savings and loan association, Lorenzo Munoz–Franco and Francisco Sanchez–Aran, and three commercial customers, Ariel Gutierrez, Wilfredo Umpierre Hernandez and Enrique Gutierrez–Rodríguez, were charged with bank fraud, misapplying bank funds, making false entries in banking records and participating in conspiracies to perpetuate those offenses.[1] See 18 U.S.C. §§ 371, 657, 1006 & 1344 (1994).

The court received a plethora of motions relating to bail on appeal after sentencing in the middle of February 2004. Some of the motions were filed as late as August/September 2004 as to the impact of *Blakely v. Washington*, 542 U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. at 2348, 147 L.Ed.2d 435 (2000). The *Blakely v. Washington* controversy became clearer in the First Circuit after the case of *United States v. Savarese*, 385 F.3d 15 (1st Cir.2004) decided late in September 2004 and *United States v. Stearns*, 387 F.3d 104, 106 (1st Cir.2004) decided in November 2004. In both of these cases the Court of Appeals determined that if defendants failed to request the jury to decide the sentencing enhancement the matter is potentially waived subject to plain error analysis. This determination is based in the holding of *United States v. Cotton*, 535 U.S. 625, 631, 122 S.Ct. 1781, 1785, 152 L.Ed.2d 860 (2002) (*Apprendi* errors are subject to plain error analysis). The doctrine was recently reiterated by the opinion of the court written by Justice Breyer in the most recent case of *United*

---

**1.** Francisco Mirandes Roque was an unindicted co-conspirator who was ultimately charged separately. He plead guilty in a Plea and Cooperation Agreement. Exhibit 128. He further testified as a cooperator in the instant case.

States v. Booker, United States v. Fanfan, 543 U.S. ——, 125 S.Ct. 738, —— L.Ed.2d —— (2005). The court has waited patiently for the legal issues as to Apprendi/Blakely/Booker/Fanfan to be finally determined; that occurred on January 12, 2005. The Supreme Court in the last paragraph of the opinion of *United States v. Fanfan*, Id., Justice Breyer writing for the court, stated that the holding applied to all cases pending on appeal but subject to "prudential doctrines" of "plain error." The court is, hence, ready to rule on all pending bail on appeal issues.

## II. THE INDICTMENT

The Indictment charges in Count One that co-defendants Lorenzo Muñoz–Franco, Francisco Sánchez–Aran, acting as Executive Officers of a federally chartered loan association or bank, and Ariel Gutierrez and Wilfredo Umpierre (outsiders/clients) with conspiring in violation of 18 U.S.C. 1344, misapplication of bank funds (18 U.S.C. 657) and/or false entries into the books of the bank, (18 U.S.C. 1006). (Third Superseding Indictment, D. 1275.) All relating to loans granted to construction entities in which Ariel Gutierrez was the President of the bank and/or a principal executive officer and Wilfredo Umpierre was the Vice-president. Those same four defendants were charged with bank fraud under 18 U.S.C. 1344 in Count Three (Muñoz–Franco and Sánchez–Aran as bank executives and/or insiders as aiders and abettors.)

In count two Muñoz–Franco and Sánchez–Aran are charged with a conspiracy to commit bank fraud under 18 U.S.C. 1344, misapplication of bank funds under 18 U.S.C. 657, and false entries in book reports and statements etc. under 18

U.S.C. 1006, as to corporations owned by Francisco Mirandes Rogue.[2] The latter plead guilty in 1997 to conspiring to defraud the bank and to defraud Caguas Central and for misapplication of bank funds and was sentenced to thirty-seven months in jail and two years probation by the undersigned judge. Count four is a substantive charge against Muñoz–Franco and Sánchez Aran as to bank fraud under 18 U.S.C. 1344 and false entries on bank records under 18 U.S.C. 1006.

Counts Five to Eight allege a misapplication of bank funds under 18 U.S.C. § 657 against co-defendants Muñoz–Franco, Sánchez–Aran, Ariel Gutierrez and Francisco Umpierre. (A non guideline count, pre November 1, 1987.)

Four co-defendants were found guilty of all counts as to which they were indicted. Another co-defendant Enrique Gutierrez was found innocent by the jury as to all the counts wherein his brother Ariel Gutierrez was found innocent.[3]

After nearly one and a half contentious years of trial, the jury in this case returned guilty verdicts on May 2002 with respect to all counts against Defendants Lorenzo Munoz–Franco (Counts 1–8), Francisco Sanchez–Aran (Counts 1–8), Ariel Gutierrez–Rodriguez (Counts 1, 3, 5–8), and Wilfredo Umpierre–Hernandez (Counts 1, 3, 5–8). Numerous Rule 29 motions followed after the verdict was rendered which were ultimately decided by the court on February 6, 2003, (Docket No. 1339). The defendants then filed Motions for New Trial which the court also denied in various orders discussed herein. The guilty defendants have all appealed. The only remaining issue is Bail on Appeal

---

2. Mirandes was a friend and neighbor of co-defendant Lorenzo Muñoz–Franco.

3. An inconsistent verdict is alleged, the court disagrees, as explained below based on the

cases of *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), *United States v. Figueroa–Encarnación*, 343 F.3d 23, 30 n. 4 (1st Cir.2003).

which is the object of this order. At this time, the court considers the Bail on Appeal motions with respect to the four guilty Defendants.

### III. THE FACTS PROVEN AT TRIAL

The First Circuit has ruled that in bank fraud cases, only "intent to deceive is necessary, not intent to harm the bank." *U.S. v. Kenrick*, 221 F.3d 19, 26–29 (1st Cir.2000) (en banc) cert. denied 531 U.S. 961, 121 S.Ct. 387, 148 L.Ed.2d 299 (2000) cert. denied *Ober v. U.S.*, 531 U.S. 1042, 121 S.Ct. 639, 148 L.Ed.2d 545 (2000). ("[T]he intent necessary for a bank fraud conviction is an intent to deceive the bank in order to obtain from it money or other property. 'Intent to harm' is not required.")

### A. FACTS RELATED TO THE BORROWER

The court rendered an Opinion and Order on February 11, 2004, (D. 1502 amended at D. 1517), providing a detailed amount of loss per construction project per defendant. The incriminating evidence per defendant per count was set forth prior thereto by the court at the Opinion and Order denying Rule 29 request, (D.1339). The court now highlights these facts as they affect the pending bail on appeal matter.

Bank loans by Caguas were granted to corporations Transglobe Manufacturing and Modules Manufacturing wherein co-defendants Enrique Gutierrez and Ariel Gutierrez were executives, (hereinafter referred to as Modules or Transglobe).[4] Some of the loans were granted prior to the enactment of the criminal law on October 12, 1984. Refinancing of these partic- ular pre October 12, 1984 loans followed after the enactment of the criminal law. As to these refinanced loans moneys were deviated from then without Board approval to other prior non related loans, and/or moneys were deviated to said loans from other later loans granted after the enactment of the criminal law also without Board approval. (La Marina Project; Levittown Plaza; Quintas de Country Club. Refinancing occurred after enactment of the law.) A series of other construction loans were also granted to said corporations, hereinafter related as "Modules," post enactment of the law on October 12, 1984: Villa Alba Project, Los Caciques Project, Los Mameyes Project, Cerrovista Project. See Docket 1502, Ex. I(a)-(g).

(1) The module houses pre and post October 12, 1984 were not being timely built by the contractor but were paid by the Bank. (Docket 1339, Rule 29, Opinion and Order.)[5] (2) Modules was paid for work not completed. In many projects dozens of houses were fully not constructed yet payment was made by the bank. In some of the last construction projects, payments were made covering entire urbanization projects (dozens of houses) but not a single house was built, (Docket 1339, Docket 1502–Ex. I, Ex. II description of incomplete constructions).

(3) Monies destined for a particular building project were used to pay unrelated prior noncomplying loans of Modules/Transglobe all owed to the Caguas Bank and/or used for building expenses of other construction loans of Module also owed to Caguas Bank and even used to pay for land of future construction loans, (Docket 1339; Docket 1502). The result of

---

**4.** Transglobe was a construction/general contractor company; Modules was a housing manufacturing company, manufacturing cement modular type houses.

**5.** Docket 1339 is the Opinion and Order under R. 29 of the court dated Feb. 6, 2003, with specific references to the record.

all monies deviated from one construction loan to another unrelated loan was that the new loans were severely weakened and the construction was destined for inevitable noncompliance. **The bank documents of each loan do not contain any reference authorizing the use of moneys for other prior bank loans; nor was there any language of "work out loans" in the loans object of the indictment.**[6] Further, the bank through the allowance of this procedure hid non compliance loans and took improper credit for the payment of interest as to noncomplying loans thereby creating a fictitious financial situation for the bank.

(4) The Dow phase of the Marina Project, refinanced by the bank post October 1984, after a failed loan to Modules, could not since the inception be timely started because the manufacturing plant of the Modules Corporation was located at the construction site. (Docket 1339, p. 6.)

10. The Board of Directors was not informed that the building contractor, a Gutierrez' company, that had failed in the timely construction of the Modules houses, remained as the builder of the houses, when the failed project was refinanced to an apparent third-party general contractor. (Docket 1339, p. 6.) This misinformation occurred in various Gutierrez refinanced projects.

11. Loaned amounts of money were increased in substantial amounts (mid six figures) in several loans without Board approval. (Docket 1339, p. 6. See also Ex. 1502, Ex. I and Ex. II.)

12. Loans were cash disbursed ahead of Board approval of the loan as corroborated by a comparison of the Board approval date and the prior disbursement of the loan proceeds. (Docket 1339, p. 6.)

13. Loans were granted and/or refinanced without proper information as to the economic status of the new general contractor debtor and without advising of the failure and retention of the housing construction company (Modules Corporation) in prior non complying loans. (Docket 1339, p. 6.)

14. Despite the utter reiterated failure of a debtor Modules Construction Company, the bank insisted in obligating the new general contractor debtor to use the failed Modules housing company, (Docket 1339, p. 6). The new debtor (substituting the Gutierrez corporations) then suffered that payments were substantially deducted from the refinanced contract and paid directly to the bank to satisfy prior loans of the Modules Company (new general contractors Santiago, Montilla, Burns, and Domínguez–Wolf). The construction of the refinanced project predictably suffered further noncompliance due to lack of budgeted cash.

15. Housing units were not being delivered pursuant to schedule affecting the payment of principal and interest by the debtor. (Docket 1339, p. 6.)

16. Nominee loans were established to camouflage loans to the Transglobe/Modules (Docket 1339, p. 6). The loans were not figured in the books of Caguas as loans to the Gutierrez' corporations.

17. The internal auditor J. Hernández attempted to audit the construction Loan Department. He was impeded and instructed not to audit said department by both co-defendants Muñoz–Franco and

---

6. Except as to one loan, subject of the misapplication Counts V–VIII, wherein notwithstanding that monies were authorized to be destined to another other project, the monies were misapplied. Further amounts were increased without Board approval and the cost of the land was grossly overstated and the monies were misapplied. See discussion as to Misapplication Counts, Infra, p. 31–33.

Sánchez–Aran. The internal audit request was duly supported by the external auditors of the bank. (Docket 1339, p, 8.)

18. At the Quintas de Country Club Project—loan increases were approved by Board of Directors without advising the Board of the delayed status of the construction. (Docket 1339, p. 25.)

19. At the refinancing of the Levittown Plaza loan, the loan committee was not advised of the prior failure of Modules to develop the project as required by the loan agreement and addendums. (Docket 1339, p. 25–Docket 932, p. 58.)

20. In the Los Caciques loan—a $60,000 disbursement was made prior to the Board of Director's approval of the loan. (Docket 1339, p. 25–Docket 932 p. 67–70.)

21. The Mameyes Project was never submitted to the Board's approval despite requirements of Board's approval. (Docket 1339, p. 25–Docket 932, p. 145, T. A Enriquez).

22. In general Sánchez–Aran and Muñoz–Franco concealed important information from the Board of Directors and internal auditors regarding the Gutierrez Co.'s loans.

> Question: "... could you please tell the members of this jury, whether the loan committee was advised of the Modules' failure to develop the project as required by the loan agreement and the addendums that you were able to review?"
> Enriquez: "No, they were not told."
> Question: "And was this something that they should have been told?"
> Enriquez: "Yes."
> Question: "Why is that?"
> Enriquez: "So, that they would be aware of how the project was going and so that they could make a decision as to whether these increases should be approved or not approved." (Docket 1339

p. 28; Docket 932, p. 15–16, 44, 58, Anabel Enriquez.)

## B. THE EVIDENCE AS TO SANCHEZ ARAN

(1) Co-defendant Sánchez–Aran was the primary executive supervisor of the Construction Loan Department of the Caguas Bank (Docket 1339). He was also the primary supervisor of the construction loans of the Modular company and the Mirandes' companies.

(2) Sánchez–Aran was the Bank official who authorized nominee loans to camouflage loans to the failing Modular Construction Company of Gutierrez. (Docket 1339, p. 6.) Loans to Roberto Ponce, ACANA and/or P.F. Advertising were granted but they were loans in reality to Modules—Docket 1339, p. 27, (testimony A. Somohano 6/6/00, p. 77–79, Docket No. 96).

(3) Sánchez–Aran was the Bank Executive that approved all of the false construction certificates disbursing the construction money ahead of the actual construction. The certificates were prepared by Gutierrez and Umpierre. All certificates were presented in evidence. (Docket 1339, p. 25; testified by A. Enriquez 5/7/01, Docket 943, p. 44–45; Víctor Kareh 2/01/02, p. 66, Docket 1045; F.H. Román 5/22/01, p. 37, Docket 957).

(4) The internal auditor requested Sánchez–Aran to audit the Construction Loan Department a request supported by the external auditor. Sánchez–Aran instructed that said department was not to be audited allegedly because the department was sufficiently supervised by other resources. (Docket 1339, p. 27–29, 31.)

> Question: "Mr. Hernández, who had given you those instructions not to audit the construction loan department?"
> Hernández: "Senior management."
> Question: "Who is senior management?"

Hernández: "Mr. Lorenzo Muñoz–Franco and Mr. Sánchez–Aran."

(D.1108, p. 47, J. Hernández)

Hernández: "Mr. Lorenzo Muñoz–Franco indicated to me that, that area . . . of construction loans was the most audited by senior management." (Id. P. 58)

Question: "And Mr. Hernández, in the years between 1980 and 1990, in your functions as internal auditor of Caguas were you ever provided with any internal audit conducted by either Lorenzo Muñoz–Franco or Francisco Sánchez–Aran of the construction department?" Hernández. "No." (Id. P. 59–81–84.)

## C. THE EVIDENCE AS TO MUÑOZ–FRANCO

Muñoz–Franco supported the questionable decisions of Sánchez–Aran in granting advanced payments for not completed construction to the Modular houses construction company even though other high echelon top executives questioned the decision. (Docket 1339, p. 7, testified by Executives Somohano and Anabel Enriquez.)

Anabel Enriquez met regularly for ten years with Muñoz–Franco and advised him, as President of the Bank, the status of the Modular Loans to the corporations of co-defendant Gutierrez and Mirandes. Enriquez knew the status of the noncompliance with the construction schedule and that payments to loans in principal and interest were not being made. (Docket 1339, p. 7.)

Anabel Enriquez advised Muñoz–Franco that certification payments were being made for work not having been completed (homes paid without being built) (Docket 1339, p. 7). He also advised Muñoz–Franco that the Modular Company remained as the subcontractor despite the fact that the company reiteratedly failed in prior contracts. (Docket No. 1339, p. 7). (This critical fact was not advised to the Board when refinancing of the loans occurred by the Bank to a new general contractor substituting the Gutierrez's contractor but retaining the Gutierrez corporation as the builder of Modular houses.)

(3) Muñoz–Franco and Sánchez–Aran refused to authorize the internal auditor to audit the Construction Loan Department notwithstanding support from the external auditor. (Docket 1339, p. 8.)

Anabel Enriquez discussed with Sánchez–Aran and Muñoz–Franco her concern that certifications were being paid for houses not actively built, that loans would not be repaid and that Modules remained as the housing contractor despite their repeated inability to perform as required under past loans. (Docket 1339, p. 26.)

Question: ". . . did the manner in which the Gutierrez certifications were handled at the bank, cause you any concern?"

Enriquez: "Yes."

Question: "Why was that?"

Enriquez: "Because practically monthly, each time they invoiced the certification would be ahead of construction. The projects weren't being delivered. Thus, the interest would be spent out on the project."

Question: "And did you discuss these concerns with anyone."

Enriquez: "Yes."

Question: "At the bank?"

Enriquez: "Yes." . . .

Question: "Okay. And with whom did you discuss these concerns at the bank?"

Enriquez: "As much with Doctor Sánchez–Aran as with Counsel Muñoz–Franco."

(Muñoz–Franco was the President of the bank and a lawyer by procession.)

(Docket 943, A. Enriquez 5/7/01, p. 45–46.)

Question: "What concerns, if any, did you express to Francisco Muñoz–Franco with respect to Modules loans?"

Enriquez: "In the case involving Engineer Domínguez [Wolff] [new general contractor], he had some concerns about whether the homes would be delivered to him on time. Since he was assuming a loan which carried interest and this concerned him" . . .

Question: ". . . tell us what you recall having said to Lorenzo Muñoz–Franco with respect to the concerns that you had on the Modules loans?"

Enriquez: "Well, subject to the reports on loans to one borrower that were prepared for his review the outstanding balance of the debt . . . and based on the experience that we had lived through, my concern was whether they would be able to comply and deliver the homes on time."

Question: "Who?"

Enriquez: "Modules."

(Docket 943, p. 66–69, Anabel Enriquez.) (Referring to Dow Phase of construction refinanced post October 12, 1984.)

Enriquez: "My concerns were about the delivery of the units, that they were not delivered according to the contract . . . Therefore, [they] could not repay the loans." [no money was being generated because the non constructed homes could not be sold to the public].

Question: "And did you discuss those concerns with Lorenzo Muñoz–Franco?"

Enriquez: "Yes. I submitted them . . . That is, before I discussed them with Attorney Muñoz–Franco I discussed them with Doctor Sánchez."

Question: ". . . Did you discuss with Lorenzo Muñoz the manner in which the modules loans were being handled?"

Enriquez: "I told Attorney Lorenzo Muñoz my concerns about the manner in which the loans were being handled?"

Question: ". . . did you agree with the manner in which those loans continued to be handled after you had those discussions with Lorenzo Muñoz?"

Enriquez: "I was not in agreement because the same disbursements, more or less, were made."

(Docket No. 943, p. 90–92, Anabel Enriquez.) [7]

The presentation and discussion of the Denby letter (misrepresentation to the federal auditors) to the Board of Directors was made by Lorenzo Muñoz–Franco and Sánchez–Aran. (See Denby letter details infra at 17–19.)

Question to Director Lugo

Question: ". . . Do you have a recollection as to whom you discussed the letter [the Denby (sic) letter]?"

Answer: Yes, that was specifically discussed with Mr. Muñoz–Franco and Doctor Sánchez–Aran.

(Docket 1142, p. 58, Tr. Roberto Lugo.)

## D. THE EVIDENCE AS TO ARIEL GUTIERREZ/WILFREDO UMPIERRE

Ariel Gutierrez Rodríguez was the President of Transglobe Manufacturing and Modules Manufacturing Co., Wilfredo Umpierre was the Vice–President. Both Gutierrez and Umpierre signed and delivered dozens of false construction certificates on behalf of these two corporations. The net

---

7. The fact that the Board was not properly advised as to the true economic status of Modules and its prior non compliance was testified by Annabelle Enriquez and Director Lugo. See infra, p. 26 and 28–29 and Docket 1339, p. 10 N. 5 (Lugo not aware of true financial position of Modules).

result was that the bank was paying knowingly for incomplete certificates (certificates openly ahead the actual construction). Lower level executives refused to pay the certificates. The certificates were ordered to be paid by co-defendant Sánchez–Aran with the knowledge of co-defendant Muñoz–Franco.

> Question: "... did the manner in which the Gutierrez certifications were handled at the bank, cause you any concern?"
>
> Enriquez: "Yes."
>
> Question: "Why was that?"
>
> Enriquez: "Because practically monthly, each time they invoiced the certification would be ahead of construction. The projects weren't being delivered. Thus, the interest would be spent out on the project."
>
> Question: "And did you discuss these concerns with anyone?"
>
> Enriquez: "Yes."
>
> Question: "At the bank?"
>
> Enriquez: "Yes."
>
> Question: "Okay. And with whom did you discuss these concerns at the bank?"
>
> Enriquez: "As much with Doctor Sánchez–Aran as with Counsel Muñoz Franco."(the two bank co-defendants.); [Muñoz–Franco was also a lawyer].
>
> Docket No. 943, 5/7/01, p. 45–46, T. Anabel Enriquez.
>
> Question: Ms. Enriquez, you testified that you had discussions with Lorenzo Muñoz Franco regarding concerns that you had, not only during the year 1984, but also during 1984, **but also during 1985 and 1986 regarding the Modules project.** Do you recall that? (Emphasis ours.)
>
> Answer: Yes.
>
> Question: Now, I've asked you questions regarding pre 1984, which you testified before the loan—before the projects of Levittown and Country Club were sold to Dominguez Wolff. Do you recall that?
>
> Answer: Yes.
>
> Question: And that would have been before 1984?
>
> Answer: Yes.
>
> Question: Now, regarding those concerns, before—the concerns you had about Modules being produced before those two projects were sold to Domínguez Wolff, [Domínguez Wolf] appeared post October 12, 1984 what discussions, if any, did you have with Lorenzo Muñoz Franco?
>
> Answer: My concerns were about the delivery of the units, that they were not delivered according to the contract.
>
> Question: Go ahead. I'm sorry.
>
> Answer: Therefore, we could not repay loans.
>
> Question: And did you discuss those concerns with Lorenzo Muñoz Franco?
>
> Answer: Yes, I submitted them. I submitted it.
>
> Question: Okay. And did you have—did you also discuss those concerns with Francisco Sánchez Aran?
>
> Answer: That is, before I discussed them with Attorney Muñoz, I discussed them with Doctor Sánchez.
>
> Question: And Ms. Enriquez, you testified you had discussions with Lorenzo Muñoz Franco as well as Francisco Sánchez Aran regarding the manner in which the Modules loans were being handled.
>
> Did you agree with the manner in which these loans continued to be handled after you had those discussions with them?
>
> . . .

The record in the instant case is replete with certifications of constructions signed by co-defendant Ariel Gutierrez for work not performed but paid by the Caguas Central Bank; millions of dollars paid for houses not constructed (1.2 million dollars paid to Modules at Los Caciques in con-

struction certifications for work not undertaken (Ex. I(e), D. 1502); loans not authorized by the Board benefitting the Modules Plant, Los Caciques $603,000 loan authorized without Board of Director's approval (Ex. I(e), D. 1502); moneys disbursed from construction loans to pay other Gutierrez's loans (Los Caciques $65,000, Cerro Vista Project $932,177) (Ex. I(g), D. 1502); pre manufacturing expenses allegedly incurred by the Modules Plant but not a single unit was manufactured, $751,500.00 and $157,500.00 at the Cerro Vista, (Ex. I(g), D. 1502); payments for foundation work not poured or set at the construction site, $66,000.00 Jardines de Villa Alba, (Ex. I(d), D. 1502); moneys disbursed prior to construction; the signing of the construction loan agreement, $231,000.00 Jardines de Villa Alba (Ex. I(d), D. 1502); moneys paid by third parties to Modules to be applied to loans but Modules retained the money and fails to pay the bank loans, (Los Mameyes Project, Ex. I(f), D. 1502); $1.2 million paid by P.R. Housing Authority to Modules—Modules retained the money and failed to pay for the advanced money provided by the Bank). The moneys received were not mere book keeping entries and/or signed notes. See generally Ex. I(a)-I(g) of Opinion and Order of February 11, 2004, Docket No. 1502. Ariel Gutierrez benefitted from the payments, loans were paid and/or partially paid, guarantees must have logically been released upon payment. (No proof has been received in evidence that Ariel Gutierrez collaterals were executed by the bank on Modules' loans that failed.) Because the court only calculated loans up to $5,000,000 pursuant to the November 1, 1987 Guidelines, § 2F 1.1(b)(1)(L), notwithstanding that unearned direct disbursement money far exceeded of $5 million, the court declined to downward depart as to Ariel Gutierrez, Docket 1520, p. 16.

Interestingly when a new general contractor developer/borrower substituted Transglobe Manufacturing (Gutierrez's corporation) as the general contractor, the bank permitted the Modular Company to remain as the manufacturer of the houses notwithstanding its utter failure in performance records. The new developers were sought by Ariel Gutierrez and Wilfredo Umpierre and accepted by the Bank.

For example, developer Montilla was rejected prior thereto three times by the Caguas Bank but was accepted, contingent on the use of modules houses manufactured by Gutierrez. (Docket 1118, p. 3–5, Tr. Montilla.) Montilla was found as a developer/new borrower by co-defendant Wilfredo Umpierre. He received funding in one month of $1,000,000.00 for Jardines de Villa Alba. In relation to this loan, Modules received direct payment of $230,000.00 from the loan proceeds without approval or knowledge of Montilla. (Docket 1118, p. 13, Tr. Montilla.) The loan settlement was faulty, in reality instead of budgeted $747,500 available to Montilla to develop the project only $485,000.00 was available. (Docket 1339, p. 14.) Montilla further testified that several checks appeared endorsed by him when in fact he did not endorse them. The result was that Modules (Gutierrez company) received disbursements directly from Caguas Central without approval from Montilla. Hence, the conspiracy continued, the misrepresentations to the Board continued, the scheme continued but this time using new developers who also lost moneys to the benefit of Modules.

A similar scenario occurred with new general contractor Mr. Enrique Santiago, who was also accepted as a new general contractor contingent on the use of Modules houses for the refinancing of the loan.

"Ariel Gutierrez offered to obtain financing from Caguas Central for Mr. Santiago if he used modules for his project. T.T. E. Santiago, 7/3/01, p. 14 (Docket

No. 998). Ariel Gutierrez obtained financing for Mr. Santiago from Caguas Central in approximately four weeks. Id. Mr. Santiago testified that he never received any of the $750,000 disbursed by Caguas Central. Id. p. 33. Further testimony established that Mr. Santiago never knew he had obtained financing, some checks were made to the order directly from Caguas Central to Modules, other checks seemingly endorsed by Mr. Santiago were not endorsed by him at all, and one check was even used to pay a Module commercial loan with Caguas without Mr. Santiago's knowledge. Id. *See also* Exhibit 15(gg)." Docket 1339, p. 15.

New developer John Burns also experienced similar preferential treatment by the Caguas Bank if Modular units were used.

"John Burns, another housing developer testified that his request for financing of a two hundred (200) conventional unit housing development had been repeatedly denied by Caguas Central. Defendant Umpierre made Mr. Burns an offer similar in nature to that received and accepted by Mr. Santiago and Mr. Montilla. Umpierre would obtain the financing if Mr. Burns used modules instead of conventional housing units. Mr. Burns accepted the deal. After one week, Caguas Central approved an $8.9 million dollar loan for the Cerrovista project. T.T. J. Burns, 8/17/01, p. 16, 24 (Docket No. 1073).

When Sanchez–Aran made the pitch for the Cerrovista loan to the Caguas Federal Board of Directors, a $1.4 million dollar request was made for land costs. The actual land cost was $480,000. The difference was ultimately utilized to repay prior outstanding debt owed by Modules to Caguas on other loans and bring the Gutierrez loans to current sta-

tus. Exhibits 24(a), 59, 10(a), 116(a), 2(d). The jury could have easily concluded that Ariel Gutierrez and Umpierre were basically finding developers without the ability to obtain financing, and using the developers as fronts to obtain funds directly from Caguas Federal. The disbursements were then made to keep loans current and consequently prevented any Gutierrez companies from falling into bankruptcy." Docket 1339, p. 15–16.

This evidence was presented in addition to the Gutierrez connection with Munoz–Franco and Sanchez–Aran in regard to not properly presenting all loan information to the Board of Directors as to Modules corporations, disbursing funds prior to loan approval, allowing over nine hundred thousand in overdrafts to Modules corporations, establishing nominee loans disguising Modules loans, and using false certifications at the request of Defendant Ariel Gutierrez and/or Defendant Wilfredo Umpierre (certificates ahead of the actual construction). Without the critical aid of Ariel Gutierrez and Umpierre, the activities of the senior officials at Caguas Central would have been impossible and fruitless. While the acts of Ariel Gutierrez and Umpierre are sufficient to establish Count 3, their involvement and assistance with the actions of Munoz–Franco and Sanchez–Aran is also sufficient to establish them as aiders and abetters to bank fraud.

As to the required intent to defraud Caguas Central, the evidence and testimony presented regarding the misrepresentations and fraudulent pretenses surrounding the various loans and disbursements to Modules more than substantiate the fact that Ariel Gutierrez and Umpierre intentionally acted to defraud Caguas Federal and obtain funds through their illegal actions.[8] Offers to obtain funding, accep-

8. Intent to deceive is sufficient at law in bank fraud cases and "intent to harm is not re-

tance of disbursements to other unrelated loans payments of submitted false construction certifications, misstatements to presentations to the Board of Directors would not have taken place but for the intent on the part of Defendants to defraud Caguas Central and of illegally obtaining the necessary funds for the Bank to stay afloat and repay prior debts of non-complying loans.

## E. EVIDENCE AS TO MISAPPLICATION COUNTS AS TO MODULE LOANS

The evidence as to misapplication of Counts V–VII was indeed clearly incriminating. Relating to the Cerrovista loan, a written representation was made to the Board of Directors that the money needed from loan proceeds for land cost was to be $1.4 million and was to be applied for this purpose. **The actual land cost was $480,000.00.** Only the $480,000.00 was actually used for the purchase of land despite the more lucrative but false representation to the Board and subsequent disbursement of land cost. (Docket 932, p. 117, T.A. Enriquez). (See also Docket 1339, p. 19). The Board was advised that the loan settlement agreement showed that $855,323 would be used for the repayment of Quintas de Humacao Project. Little did the Board know that not only was more money to be disbursed, $932,177, but also that the moneys were not to be used to pay principal and interest in the Quintas de Fajardo loan, but also for interest due the Gaviotas Loans, and interest on a Modular commercial loan (Ex. 24(a), 59, 10(a), 116a, 2d. T.A. Enriquez, 4/26/01, p. 140, D. 932).

**"This is a clear unambiguous example of a disbursement from one loan being used to the repayment of another loan**

totally ignored but disguised to the Board of Directors. Further, at no point were the funds authorized by the Board of Directors paid to Quintas de Humacao as specified by the Board of Directors rather the monies were used for the repayment of four unauthorized and undisclosed prior construction and commercial loans of Gutierrez corporations." The excess of land cost monies were used to repay other construction loans. (D.1339, p. 19)

The Board was not only deceived as to the extent of the partial assumption of loans, but was also deceived as to who was ultimately to receive the bank funds. Further, the $855,323 was increased to $932,177.00, and were not used for infusion of moneys into the Humacao Project, but were instead also used for repayment of various other debts owed by Gutierrez to Caguas Central. This particular use of funds was never approved or envisioned by the Board of Directors.

Defendant Sánchez–Aran has challenged the misapplication counts alleging that the $932,177 were not bank funds. The court strongly disagrees. First, there was an unauthorized increase from $855,323 to $932,177 (that is $76,854.00). Second:

"... Defendant Sanchez–Aran argues that since Caguas Central issued a check to the Gutierrez for the 'purchase' of Quintas de Humacao, the funds belonged to the Gutierrez, and any action taken from that point cannot be misapplication since the funds no longer belong to Caguas Central. Defendant Sanchez–Aran then concludes that only the first transfer from Caguas Central to the Gutierrez could be a misapplication since that was the only transfer of

quired." *United States v. Kenrick,* 221 F.3d 19, 29 (1st Cir.2000)(en banc) cert. denied 531 U.S. 961, 121 S.Ct. 387, 148 L.Ed.2d 299

(2000) cert. denied 531 U.S. 1042, 121 S.Ct. 639, 148 L.Ed.2d 545 (2000).

'bank' funds. Defendant's argument is faulty."

The funds did not cease to be controlled by the express purpose for which they were disbursed. The Board of Caguas Central authorized the disbursement of funds to Quintas de Humacao for the repayment of the Quintas de Humacao loan.[9] This was the purpose for which the funds were disbursed and any other use of Caguas Central's funds would be misapplication. The fact that the $932,177 check was endorsed does not change the express purpose for which said funds were to be used. The second transfer, the Gutierrez' endorsement back to Caguas Central for the repayment of four separate loans, is still the use of bank funds and subject to misapplication. At no point could the disbursement by Caguas Central be characterized as anything but funds of Caguas Central subject to the conditions set by the bank itself.

In this case, the misapplication occurred when Defendants used Caguas Central funds without approval from the bank itself as to the amount of funds to be disbursed, how the funds were to be used, or who was to use the funds. This was accomplished by withholding information from the Board of Directors when the loan was presented, making decisions regarding Modules without approval from the Board of Directors, and **by failing to notify the Board of Directors that loans were being used to make principal and interest payments on other unrelated Gutierrez loans.** Because of the actions of Munoz–Franco, Sanchez–Aran, Ariel Gutierrez, and Umpierre, the Board of Directors of Caguas Central Federal Savings and Loan Association of Puerto Rico was unable to make properly informed decisions regarding how the bank funds were to be utilized." (Emphasis ours) See Docket 1339, p. 20–21.

## F. DENBY LETTER

The Denby letter, dated January 10, 1988, Ex. 186, is a response to an auditor from the Federal Home Loan Bank directed to the government bank auditors. It is a letter prepared by co-defendants Muñoz–Franco and Sánchez–Arán for the Board of Directors to consider. The Board of Directors depended on the representations made by Muñoz–Franco and Sánchez–Arán.[10] (The discussion of the Denby letter was an object of two Opinions of the court at Dockets 1502, p. 4–6, and Docket 1526.)

Question: "And who prepared the response to the Bank examiners?"

Answer: The President [Muñoz–Franco] and the Executive Vice–President [Sánchez–Arán]. (Docket 1339, p. 9 § 3.)

The Denby letter contains various misrepresentations. The letter contains misrepresentations as to various **operational** issues which are matters not known by Board members. The document also contains other critical material misrepresentations.

"This Board of Directors wishes to state in no unclear terms and uncertain terms that it has never considered and much less approved any policy or practice of permitting borrowers to use construction loan proceeds to satisfy or make payments on other unrelated loans."

---

9. This is the **only** loan alleged in the indictment wherein a payment to another loan is authorized but the money was deviated to yet other Gutierrez's loans.

10. This response letter was prepared after discussion with the Board on facts represented by Muñoz–Franco and Sánchez–Aran was signed by the entire Board and Muñoz–Franco.

Mr. Kareh, the Manager of the Construction Loan Department, spent thirty-two days on the stand at trial explaining, on a loan to loan basis of the Modular Construction loans of Mr. Gutierrez and on the loans of Mr. Mirandes, how millions of dollars were moved to repay principal and/or interests of other prior noncomplying loans and how the moneys were diverted to other construction expenses of other construction project financed by the Caguas Bank. The testimony was not opinion testimony but testimony based on the issuance of checks and the tracing of their movement. The moneys of newly granted loans were used to satisfy principal and/or interest in past noncomplying loans, all corroborated through the ledger cards of all the loans stated in the indictment and the ledger cards of the construction projects where the moneys entered. The result was inevitable, the newly granted construction project, suffering the loss of funds, was doomed to fail. (All the Gutierrez construction projects, object of the indictment, failed.) Further, an illusion of economic well being was being fictitiously created to Directors and regulators as the impression was being created that principal and interests were being properly paid. (Docket 1339, p. 10, no. 5.) During 1984–1986 not a single penny was paid by the Modular Construction Company of principal and interest that was not derived from loans provided by the Caguas Bank. (Docket 1339, p. 10, no. 5) (testimony of Mr. Fabregas 6/7/01, Docket 966, p. 48–63). The bank was fictitiously creating economic gains from interest paid and was, hence, **not** forced to carry the losses of the loans not properly being reported to government auditors. The bottom line was a fictitious financial report to the Board of Directors. Muñoz–Franco and Sánchez–

Arán received considerable pay increases and bonuses during the periods of time that the described loans kiting procedure occurred. (See Docket 1520, p. 2–4; describing bonuses and increases received by Muñoz–Franco and Sánchez–Arán during said period of time.)

The Denby letter response also created the impression that the Board had full knowledge of the banking relationship with Modules which they clearly did not. (The Board had no knowledge that Modules remained as house manufacturers in refinanced construction projects wherein they had previously failed as debtors, general contractors, and manufacturers of houses. (Docket 1339, p. 11.) (Testimony of Board Director Lugo and Executive Anabel Enriquez) (compare to the statement at Docket 1339, p. 11, N. 6.)

Further, the Denby letter totally misrepresented facts relating to the Villa Alba Project. The housing project had already been totally paid to Modules including certifications for foundations. The letter stated that there would be no loss because with the houses built at the project were sufficient equity for the bank. The problem was that there was only one house built and erected at the project of the twenty-three houses fully paid.[11] (Docket 1339, p. 13–14.)

## G. MISREPRESENTATION AND/OR MATERIAL OMISSIONS TO THE AUDITORS BY SANCHEZ–ARAN AND MUÑOZ–FRANCO

(1) Substantial moneys were distributed to Modules not only ahead of schedule under false certifications but without informing the auditors that the sales of the houses were minimal. (Docket 1339, p. 12.)

---

11. Co-defendants alleged that the houses were built and remained at the factory. The problem is that the language of the letter provides an impression to the Board and the government auditors that the houses were built and at the building project.

(2) Sánchez–Arán had the duty to disclose that he was approving construction certificates for work not performed. (Docket 1339, p. 13.) This fact affected adversely the condition of the loan.

(3) Muñoz–Franco and Sánchez–Arán failed to **timely** disclose that new unrelated construction housing loans were being used to repay noncompliance principal and interests of prior loans. (Muñoz–Franco and Sánchez–Arán finally later admitted this fact to the auditor Joseph González).

(4) The Caguas Bank should not have been reporting as income the money transfer from new construction loans to repayment of past construction loans.[12]

(5) The construction loans for Modules and Mirandes showed the recognition of income on its books despite the fact that it was an inappropriate and a fictitious income.

(6) Loans receiving substantial moneys in principal and interests from other unrelated loans should have been reported.

(7) Loans were increased and/or provided without Board approval (see discussion infra).

The net result of the scheme created by co-defendants Muñoz–Franco and Sánchez–Arán included payments of false construction certificates, payment of overdrafts in excess of $950,000.00, nominee loans in excess of $100,000.00, check kiting schemes, the issuances of new construction loans to cover up failed construction loans, and continuance of the scheme through the refinanced loans. The scheme constituted a sophisticated kiting scheme made not through checks but by using construction projects involving Modules houses manufactured by corporations directed by co-defendant Ariel Gutierrez. The described scheme created a fictitiously framed bottom economic line benefitting the Caguas Bank similar to the facts set forth in *United States v. Stedman,* 69 F.3d 737, 738–741 (5th Cir.) cert. denied 517 U.S. 1250, 116 S.Ct. 2512, 135 L.Ed.2d 201, rehearing denied 519 U.S. 912, 117 S.Ct. 280, 136 L.Ed.2d 200 (1996), where the Appellate Court determined as improper the withholding, by corporate executives, of similar pertinent information from regulators causing that "intended loss" to be assessed as to the entire resulting loss of the loan.

### H. THE MIRANDES CONSPIRACY[13]

Much of the conduct outlined above regarding the Gutierrez's loans as to Modules corporations involving Muñoz–Franco and Sánchez–Arán was also taking place simultaneously as to the Mirandes' loans. Loans were disbursed without Board's Directors full knowledge or approval and loans were used to repay interest on other Mirandes' loans (the loan documents did not reflect that they constituted "work out loans" nor was the Board of Directors advised that the loans constituted work out loans). Construction certificates were authorized for work not performed and/or

---

**12.** This fact is critical there was absolutely no language in the construction loan documents nor in the Board of Directors minutes that the loans object of the indictment "were work out loans" except the Villa Alba loan wherein the misapplication of funds occurred. The budget to construct the housing project and/or the projected disbursements did not contemplate disbursements to other loans.

**13.** Francisco Mirandes Rogue had a business relationship with the Bank as a contractor and developer from 1979–1990. T.T.F. Mirandes, 8/21/01, pp. 4–7 (Docket 1092). Mirandes plead guilty in 1997 to conspiring to defraud the Caguas Bank and for misapplication of bank funds and was sentenced to thirty-seven months in jail, two years probation and one hundred twenty days of community service. T.T.F. Mirandes, 8/21/01, pp 10–20. Mirandes was also the neighbor of co-defendant Muñoz–Franco. T.T. F. Mirandes, 8/21/01, p. 25 (Docket 1092).

incomplete, notwithstanding certified as in compliance of work performed. Further, funds of loans were deviated for construction expenses of other unrelated projects. See generally, *Sentencing Opinion and Order*, February 11, 2004, Docket 1502, Ex. 4 II(a)-(m).; Valle Bello Project (Ex. I(i)-(e), D. 1502, $200,000.00.); Villa Santa Juanita (Ex. II(k), Docket 1502, $162,000.00); Paseo Santa Juanita Project, Ex. II(j), Docket 1502, $93,000.00; Valle Piedras Project (Ex. II(I), Docket 1502, $185,000.00. All of these loans were post October 12, 1984, that is after the enactment of the criminal statute. Mirandes further protested the use of new loans to repay past existing loans, but Sánchez–Arán insisted that the plan had to be followed. (Docket 1092, p. 125.) Further, the Caguas Bank made direct transfers of funds from Mirandes' loans to Caguas Bank for repayment of other loans without Mirandes' authorization. (Docket 1092, p. 73). Although the Bank official that was primarily involved in the supervision of the Mirandes' loans was Sánchez–Arán, Muñoz–Franco had direct contact with Mirandes concerning these loans, reviewed Board of Directors minutes and was kept well-informed. (T. Enriquez, Docket 929, p. 40, 45, 46, Docket 929; Docket 930, p. 83, 95; Tr. Mirandes 8/21/01, Docket 1092, p. 26, 83–85.) Examples of construction loans of Mirandes wherein loan proceeds were used to repay prior loans are, amongst others, the following: (1) Villas del Gurabo II—$100,000 used to pay other loans, Ex. II(s), Docket No. 1502 (November 1985–August 1987); (2) Jardines de Bubao Project, a loan executed on December 1984, after enactment of the criminal statute, wherein $25,000.00 were used to pay Reparto Valenciano Project, and $500,000.00 to pay other construction

loans. (Docket No. 1502, Ex. II D; (3)Jardines de Bubao II Project, a loan executed on April 2, 1985, wherein $478,000.00 was disbursed to pay other Mirandes' Project, Docket No. 1502, Ex. II(e). There were also other instances wherein the loans were considerably augmented without notice nor approval from the Board of Directors. (Valle Bello Project, August 1989, Docket No. 1502 [14] Ex. II(m), a $525,662.00 loan increase was disbursed as an unauthorized loan increase).

The Court grants and concedes that evidence as to loans pre October 12, 1984 was presented before the jury. Only two loans are pre October 12, 1984, Villa Gurabo and Reparto Valenciano. Thirteen projects were disbursed post October 12, 1984. The evidence was admitted as background evidence to: (1) demonstrate a pattern of special treatment received by Mirandes, who was Muñoz–Franco's neighbor. As to these loans, the following occurred: (a) Loans amounts were disbursed ahead of Board authorization, ($400,000.00 Reparto Valenciano) and; (b) increases in loans were not authorized ($1.8 million Reparto Valenciano, (Ex. II(a), Docket 1502). This particular evidence demonstrates that the policy of payments from one loan to another dated since at least 1983 (Villa Gurabo II Project, Ex. II(b), Docket No. 1502.); further, and most critical, (2) to demonstrate that payments from subsequent loans granted after October 12, 1984 were used precisely to repay these first two loans or other prior loans of Mirandes Roque.

As in the case of the Gutierrez's loans, payments of construction certificates were made ahead of schedule by specific authority of Sánchez–Aran and with the knowledge and approval of Muñoz–Franco.

14. As to Docket No. 1502, Sentencing Opinion and Order, the court issued an errata sheet at Docket 1516.

Question: "Ms Enriquez, these certifications, the Caciques certifications [post October 12, 1984], we just reviewed and the ones that we just reviewed for Mameyes, which have your in initials to the certification, were the approvals for the disbursements or those monies based solely on your decision?"

Enriquez; "No."

Question: Under whose authorization were those disbursements made?

Enriquez: "My immediate superior Doctor Sánchez.

Question: "Okay. Now, Ms. Enriquez, was this usual for Doctor Sánchez Aran as chief lending officer of the bank to become involved in the payment of construction certifications?"

Enriquez: "Any time we needed to discuss certifications with him we would do so."

Question: "But my question was, was it usual for him to become involved in the payment of these certifications?"

Enriquez: "In those loans involving Modules or Mirandes, yes."

Docket 943, p. 44–45, Tr. A. Enriquez.

Question: ". . . did the manner in which the Gutierrez certifications were handled at the bank, cause you any concern?"

Enriquez "Yes."

Question: "Why was that?"

Enriquez: "Because practically monthly, each time they invoiced the certification would be ahead of construction. The projects weren't being delivered. Thus, the interest would be spent out on the project."

Question: "And did you discuss these concerns with anyone."

Enriquez: "Yes."

Question: "At the bank?"

Enriquez: "Yes."

Question: "Okay. And with whom did you discuss these concerns at the bank?"

Enriquez: "As much with Doctor Sánchez–Aran as with Counsel Muñoz Franco." Docket No. 943, p. 46, Tr. A. Enriquez.

Of all the construction loans of the Caguas Bank, only the Gutierrez's and Mirandes' loans received preferential treatment in the form of authorization by Sánchez–Arán of construction certificates for work not performed. (Tr. A. Enriquez 5/8/01, p. 39, Docket No. 944). The final economic result of the Mirandes' loans granted by the Caguas Bank was that when the Mirandes' companies ceased .to exist due to insolvency, they owed the Caguas Bank $23 million, (Docket No. 1339, p. 41; Docket No. 1092, p. 133). The Gutierrez's loans produced a loss to the bank in excess of $10 million (*Sentencing Opinion and Order*, Feb. 11, 2004, Docket No. 1502).

As to both, the Gutierrez's loans and the Mirandes' loans a well-developed and carefully thought out fraudulent scheme was executed by co-defendants to postpone the financial collapse of the institution creating a fictitious financial scenario of performing loans, of income derived from past loans when in reality they were non performing loans which mandated reserves causing losses. The plan disguised the true financial reality of the bank. The facts are remarkably similar to the financial disguise to the Board of Directors found in the case of *United States v. Stedman*, 69 F.3d at 739. In *Stedman*, the Court stated that as a result of the scheme of the two officers of the bank, the bank "avoided unwelcome decreases in capital because the regulators did not require it to increase its loan losses reserves, which would have been the likely result had [the regulator[s]] not been denied access to the negative borrower information. By this scheme [the bank's] assets were fraudulently made to look better than they were."

Finally, contrary to the seemingly attractive argument made by co-defendants Muñoz–Franco and Sánchez–Arán, the defendants enjoyed a personal gain by the scheme. They retained employment and were granted generous increases and bonuses by not revealing to regulators and/or the bank directors the true financial status of the Gutierrez's and Mirandes' loans. "... they both received considerable increases in salary and bonuses during the period of time of the conspiracy. The increases and/or the bonuses were directly related to the economic performance of the Caguas Federal. Co-defendant Muñoz–Franco received in 1984 an $80,000.00 bonus based on an extraordinary economic performance of the Caguas Federal Bank for the year 1983, Sánchez–Aran received a bonus of $45,000.00, (Ex. 68B, Board of Director's Compensation Committee Minute of January 12, 1984). Muñoz–Franco further received a bonus of .004684% of a 11.1 million-dollar profit of the bank ($52,000.00) effective November 1, 1984 and Sánchez–Aran a bonus of .00375% of a 11.1 million profit ($41,600.00) effective November 1, 1984. (Ex. 62–C Board of Director's Compensation Committee Minute of Jan. 10, 1985). (See Ex. A and B to this Order.) Further, during the years of the conspiracy the defendants received considerable increases in salary based upon "excellent performance during last year's operations [of the Bank]. A net income of 12.3 million and a substantial production of productive assets was realized this year [1984]." (Ex. 70b, Minute of Board of Director's Compensation Committee of November 27, 1985.) (Ex. "C" to this Order.) An examination of the salary of co-defendant Muñoz–Franco reveals that he received an increase in salary from a total compensation of $163,167.00 in 1983 to $263,000.00 in 1984 to $276,784.00 in 1987. Co-defendant Sánchez–Aran received an increase from $91,500.00 in 1983 to $150,300.00 in 1984. (Ex. ZZ1 and ZZ, Ex. D and E of this Order.) Both continued receiving excellent salary benefits, co-defendant Muñoz–Franco raising to $276,784,00 in 1987 and co-defendant Sánchez–Aran to $291,400.00 in 1988 (see Ex. ZZ–1, Ex. D of this order).

All the increases and bonuses to co-defendants Muñoz–Franco and Sánchez–Aran were granted by the Board of Directors based on the "excellent performance" of the bank. However, that performance is tarnished by the conduct of defendants of creating "a well developed scheme to disguise the true economic state of Modules and Mirandes's loans. The conduct was a sophisticated kiting like scheme using construction loans instead of checks," (Sentencing Opinion and Order of February 11, 2004, Docket No. 1502, p. 6). Through this scheme construction certifications were paid notwithstanding that they were not earned; moneys from construction loans were used to pay interest and principal of other past due construction loans; moneys were advances for houses not constructed and/or moneys were advanced to start up the Modules factory (pre manufacturing expenses) for a housing project and not a single house was constructed. See Ex. I(g) at Docket 1502. The net result is that the bottom profit line was considerably enhanced because interests of payments were being recognized as income when the payments were made from other construction loans; further non performing loans were disguised by making them current and performing loans through the granting of subsequent loans for other construction projects. The reserve properly made would have further lowered the economic bottom line. Hence the "kiting like scheme" set forth in the instant

case, as in the case of *United States v. Stedman,* 69 F.3d at 739, was designed to "make loans appear healthier to the regulators" and hence appear to the Board of Directors as a healthier bank institution." Docket 1520, p. 2–4, Order as to Downward Departure Request, March 1, 2004.

## IV. THE STANDARD FOR BAIL ON APPEAL, 18 U.S.C. 1343

Release or detention pending appeal by the defendant:

(1) ... [t]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal ... be detained, unless the judicial officer finds:

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released ...; and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in-

(i) reversal,

(ii) an order for a new trial,

(iii) a sentence that does not include a term of imprisonment, or

■ As to bail on appeal, the defendants have the burden of proof in their requests. *United States v. Bayko,* 774 F.2d 516, 520 (1st Cir.1985). Further, the statute has a strong language that a convicted felon "shall [be] order[ed][to] ... be detained unless the person meets the two required criteria." The first criteria is that the person is not "likely to flee" or "pose a danger to the safety of any other person ... or to the community if released." The Court harbors no doubt that all defendants

convicted will not flee and that, by the nature of the crime involved, bank fraud, they do not pose a danger to the community. The Court is also aware that as to the second criteria applicable, the jurisprudence of the First Circuit Court does not envision that the "substantial question of law presented" requires a "result [of] reversal" but merely that the issue presented be a "close question" or "one that very well could be decided the other way," *United States v. Bayko,* 774 F.2d at 522–523 citing *United States v. Giancola,* 754 F.2d 898, 901 (11th Cir.1985). The Court shall therefore use this standard. See also *United States v. Colón Berríos,* 791 F.2d 211 (1st.Cir.1986), dissenting opinion Torruella C.J. (citing the Bayko standard).

■ There are, however, noteworthy otherwise applicable ground rules: a party may not raise arguments, not raised below, at the bail request or on appeal. *United States v. Bayko,* 774 F.2d at 517–518 citing *Tarrant v. Ponte,* 751 F.2d 459, 461 n. 5 (1st Cir.1985) the matter is subject "to plain error" exception under Fed. R.Crim.P. 52(a). The "plain error" doctrine includes even *ex post facto* arguments as specifically determined in *United States v. Bayko,* 774 F.2d at 518. (Citations omitted.)

## A. DR. FRANCISCO SANCHEZ– ARAN[15]

Having developed the factual scenario landscape and having set forth standard for bail in the First Circuit domain, the Court shall entertain the bail on appeal matter per individual co-defendant. The Court selects Dr. Francisco Sánchez–Arán first. Co-defendant, Dr. Francisco Sánchez–Arán, hereinafter referred to as Sánchez–Arán, originally filed his motion for release on bond on February 11, 2004,

---

**15.** The Motion for Return of Passport, D. 1684, filed on January 12, 2005, notwithstanding the U.S. has acquiesced to the same

is denied because he must report soon to begin service.

(Docket No. 1501), followed by a motion entitled *Dr. Francisco Sánchez–Aran's Reply in Support of Motion for Release Pending Appeal* dated June 6, 2004, (Docket No. 1570),[16] and later filed *Motion Requesting Leave to File Nunc Pro Tunc* the aforementioned Reply dated June 24, 2004, (Docket No. 1595).[17] Further, on July 15, 2004, co-defendant Sánchez–Aran filed a motion to reopen sentencing with respect to Counts I–IV or, in the alternative, *Motion for Leave to Supplement Reply in Support of Motion for Release Pending Appeal,* (Docket No. 1606). This last motion is based on *Blakely v. Washington,* 542 U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), decided by the Supreme Court on June 24, 2004 and under the predecessor *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Co-defendant Sánchez–Arán has also filed a *Motion to Extend Self Reporting Date* filed on July 14, 2004, (Docket No. 1605), which is moot since the Court had extended the date of self reporting first until October 30, 2004, (Docket No. 1620) then until November 29, 2004, (Docket 1633) and finally until thirty days after resolution of the instant matter. The Court's delay was caused by the assignment to the undersigned of the Puerto Rico electoral cases and the court preferring to prudently wait for the outcome of the decision in *United States v. Booker* and *United States v. Fanfan,* 543 U.S. ——, 125 S.Ct. 738, —— L.Ed.2d —— (2005). Furthermore, Sánchez–Arán has filed a Motion entitled *Emergency Motion for Rulings for Release Pending Appeal, to Reopen Sentencing, etc.,* (Docket No.

1609), which is partially moot because the Court had extended the reporting date and because in this Opinion and Order the Court resolves all pending issues as to the Bail on Appeal and as to the request of Re-sentencing or Stay Pending Appeal under Fed.R.Crim.P. 38, (Docket No. 1609).[18] The Court acknowledges yet another motion filed by all co-defendants to extend the reporting dates thirty days after the court rules, should the ruling be adversed to co-defendants (Docket No. 1635). Finally, co-defendant Sánchez–Arán filed a motion entitled *Leave to File Reply to Government's Response ... Posing Blakely Issues* filed on August 24, 2004, (Docket No. 1614).

The Court first addresses the various requests by counsel to authorize Leave to File a Reply, (Docket Nos. 1595 and 1600). The Court grants the leave and hence the Reply filed at Docket No. 1591 and tendered at Docket No. 1595 and 1600 are hereby authorized. The granting of the Reply as to co-defendant Sánchez–Aran is reciprocal to the Court's authorizing the late Replies by the Government since the A.U.S.A. attending the instant eighteen-month trial had been serving as counsel at the Embassy in Colombia and, hence, all government replies had an inherent logistical problem. Further, all other A.U.S.A. then handling the trial were transferred from the local U.S. Attorney's Office in Puerto Rico.

## 2. THE BLAKELY V. WASHINGTON ISSUE

On July 15, 2004, co-defendant Sánchez–Aran filed a *Motion to Reopen Sentencing*

---

16. An identical motion was filed electronically numbered Docket 1591.

17. An identical motion was filed electronically numbered docket 1600 on July 6, 2004.

18. The court has further received a letter from counsel Duncan N. Stevens dated May

20, 2004, seeking a recommendation that in the unlikely event that bail on appeal or stay not be granted, Dr. Sánchez–Aran be authorized to serve his sentence in FC Eglin and/or FC Miami. The request is granted, a separate order to the U.S. Bureau of Prisons shall be entered. Letters to the Judge are not authorized under Local Rules, see Local Rule 77.3.

based on *Blakely v. Washington*, 542 U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). (Docket No. 1606). The co-defendant had filed previously a motion based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) but as to another clearly distinct issue: The fact that the statutory maximum under the statute 18 U.S.C. 1344 had changed from five (5) years to twenty (20) years on August 9, 1989, to thirty (30) years on November 29, 1990, all during the conspiracy and the jury had not made a finding of fact as to specific years of liability under the conspiracy. Co-defendant Sánchez–Aran made a restatement of the *Apprendi* argument on its *Memorandum* filed on August 4, 2003, (Docket No. p. 5),[19] in the following manner:

"Dr. Sánchez–Aran demonstrated in his initial Objections to the Government's Sentencing Memorandum that the versions of the bank fraud and misapplication statutes that existed prior to August 9, 1989, when the statutory maxima for those offenses was increased, must be applied in this sentencing. **Specifically, Dr. Sánchez–Aran showed that no overt acts in furtherance of the conspiracy took place after August 9, 1989, and that because the jury was not asked to find that the conduct in question extended past the date of the amendment, this court cannot infer that it would have so found.** The government's response largely ignores the substance of Dr. Sánchez–Aran's contentions regarding Apprendi and rests on factual errors and legally unsupported claims." (Emphasis ours.)

Subsequently in the submittal at page 10 of the *Memorandum,* co-defendant Sánchez–Arán summarized its contention as follows:

The rule imposed by Apprendi is clear: facts that would raise the statutory maximum penalty must be found by a jury, and absent a jury finding on those facts, sentencing is governed by the lightest penalty consistent with the verdict. **There is no basis for concluding that the jury necessarily found any facts regarding the continuation of the conspiracy past August 9, 1989, and accordingly the amendments of §§ 657 and 1344 that took effect on that date have no bearing on this sentencing.** (Emphasis ours.)

The Court granted the request in an *Opinion and Order* dated December 12, 2003, (Docket No. 1442, p. 12–13). Hence, co-defendants were to be sentenced facing only a five year maximum sentence.

■ Now the contention is different and is again based on *Blakely v. Washington,* Id. The contention is that the jury, and not the judge, should have decided **all** potential sentencing enhancement in this case and, hence, the district judge should proceed to re-sentence the defendants. As to re-sentencing the answer is simple, the Court has no jurisdiction since defendants have all appealed. *United States v. Distasio,* 820 F.2d 20, 23 (1st Cir.1987). "[a] docketed notice of appeal suspends the sentencing court's power to modify a defendant's sentence." As to this matter the issue is not a "close" matter of law.

■ The Court now moves to co-defendants' request to now lodge the new *Blakely v. Washington,* Id. argument **after** sentencing has occurred. (Sentencing occurred on February 12, 2004 and entered on March 5, 2004, (Docket Nos. 1509, 1510,

---

**19.** The document was entitled Dr. Francisco Sánchez–Aran Sentencing Memorandum on Apprendi and Ex-post Facto Issues and whether the Sentencing Guidelines apply to any aspect of this case filed August 6, 2003.

1511, 1512, 1529, 1531, 1532, 1534). The Court starts with co-defendant's own admittance that *"Apprendi* objections are preserved if they are raised at sentencing." *Dr. Francisco Sánchez–Aran Memorandum on Apprendi and Expo Facto Issues,* etc ... citing *United States v. Nelson–Rodríguez,* 319 F.3d at 47 (1st Cir. 2003) ("for future cases, we think it sufficient if defendant raises the *Apprendi* issues at sentencing")(Docket No. 1402, p. 9). The defendants failed to timely raise this particular sentencing request during trial and before sentencing. Second, the *Apprendi* issue currently raised three months after sentencing is a totally different issue. The current issue is that the sentencing Judge cannot decide the enhancements under the guidelines criteria as to amount of loss, more than minimal planning, abuse of trust, etc. (See Docket No. 1606 dated July 15, 2004).

The Court emphasizes that Sanchez–Arán, now, for the first time, sustains that a jury should have decided the guideline enhancements. **The Court stresses that defendants never requested said matter at the end of the jury instructions nor did they request a jury verdict form wherein these matters be determined by the jury** (Docket No. 1524, p. 48–106, Transcript of Objections to instructions including potential jury verdict forms.)

Further, all defendants filed, **prior to the sentencing hearings,** several Sentencing Memorandums and in no Sentencing Memorandum did **any defendant** request that a jury be empaneled to rule on the sentencing issues. The Court held Sentencing Hearings on December 15 through 19, 2003, on February 4, 2004 to February 6, 2004 and, finally, on February 11 and 12, 2004. No **defendant** at any of the hearing dates, or prior thereto, claimed that the matter of sentencing enhancements belonged to the jury and that the Court lacked the power to sentence defendants.

Moreover, as discussed below one of the counsel for co-defendants specifically requested that all language as to "losses" of the bank be deleted from the indictment sent to the deliberating room. Hence, the Court finds that the matter has been waived and the raising of this new matter after sentencing is tardy subject to "plain error" analysis. *United States v. Bayko,* 774 F.2d at 517–518 (no new matters can be brought at bail pending appeal).

Furthermore on the merits, recently, the First Circuit Court in the case of *United States v. Savarese,* 385 F.3d 15, 21–22 (1st Cir.2004), determined, after *Blakely* was handed down, based on the Supreme Court case of *United States v. Cotton,* 535 U.S. 625, 631, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (holding that *Apprendi* violations can be considered under plain error analysis), that if "[t]he appellant did not raise the jury trial issue in the district court, nor did he request a jury trial with respect to factual issues relating to sentencing" ... the district court's enhancement of a defendant's sentence is to be reviewed for plain error. *United States v. Savarese,* 385 F.3d at 21–22. The Court concludes, for the reasons stated below, that there is no plain error since the record justifies clearly the imposed court sentence.

In *Savarese id,* the Circuit Court stated the following: "[w]e conclude here that even if *Blakely* is held to apply to the Federal Guidelines, there is no basis for reversal in this case." The Circuit Court concluded, on the merits, that there was no plain error under Fed.R.Crim.P. 52(b); further, notwithstanding *Blakely,* the appellate court authorized a Federal Guideline enhancement to be found and imposed by the District Court. Moreover, contrary to co-defendants contention, under *United States v. Nelson–Rodríguez,* the Court may sentence the defendants if the *Blakely-Apprendi* issue was not raised prior to

sentencing. *United States v. Nelson–Rodriguez*, 319 F.3d at 47. Finally, as discussed infra, in the relevant section of this Opinion as to co-defendant Lorenzo Muñoz–Franco, supra at p. 64, n. 40, in the recent case of *United States v. Booker, United States v. Fanfan*, 543 U.S. ——, 125 S.Ct. 738, —— L.Ed.2d —— (2005), at the opinion of the court issued by Justice Breyer, the court repeated the holding anticipated by the Court of Appeals at *U.S. v. Savarese*, that the defendants not having raised the issue of the jury resolving the sentencing issues, the matter is subject to "prudential doctrines" such as that of "plain error." These matters are, therefore, "not close" since the District Court is citing First Circuit and Supreme Court precedents.[20]

The Court further denies the Fed. R.Crim.P. 38 request to Stay the Judgment, (Docket No. 2609), based on *Blakely* (the enhancements must be determined by the jury) since pursuant to *Savarese* even if *Blakely/Booker* should apply the matter is waived, subject only to plain error analysis. (Opinion of Justice Breyer at *United States v. Booker*, see analysis infra p. 64.)

As to lack of this Court authority to sentence, the co-defendants have little opportunity to prevail. *In Re Grand Jury Proceedings*, 626 F.2d 1051, 1059 (1st Cir. 1980). (The first criteria that must be met as to stay of judgment is the likelihood to succeed on the merits.) Therefore, the Court must deny the request to stay judgment at D. 2609.

The Court finds no plain error as to sentencing as to the calculation of the loss

of the bank since the Court stopped the upper end of the count as to the amount of loss as to each co-defendant, except Umpierre (he was found less responsible for loss amount), at $5 million and the loss as to each co-defendant surpasses, by far, said amount. (See Docket 1502, Ex. I and II). Further, the enhancements as to more than minimal planning, abuse of public trust etc. are fully justified by the record in this case. (More than minimal planning is justified by the long duration sophisticated kiting scheme with construction loans; the amount of loss is justified (see Docket 1502 amended at D. 1517); and the defendants were undoubtedly President and Vice–President of a federally chartered bank.) Since the defendants failed to request the Court that the jury had to decide any and all enhancements instead of the court, the argument was waived and the Court retained authority to sentence the defendants. *United States v. Savarese*, 385 F.3d at 21–22; *United States v. Booker*, 543 U.S. ——, 125 S.Ct. 738, —— L.Ed.2d —— (2005) (Justice Breyer "prudential doctrines of plain error," majority opinion).

The Court now proceeds to examine other grounds alleged by co-defendant Sánchez–Arán that may constitute "a close question" under the case of *United States v. Bayko*, 774 F.2d at 523.

### 3. IMPROPER USE OF EX. 40

The Court analyzed this matter thoroughly in its *Order as to Judgment of Acquittal and/or New Trial*, (Docket No. 1528).

---

**20.** The doctrine of waiver and plain error was reiterated by the Circuit Court as to Blakely sentencing issues in the case of *United States v. Stearns*, 387 F.3d 104, 106 (1st Cir.2004) ("although the Supreme Court has decided to expedite its review of the issue of Blakely's impact vel non upon federal sentencing guidelines, we need not await its disposition before rejecting the Blakely argument in the instant case. First, Stearns did not present a Sixth Amendment—based challenge to the district court's § 4B.1.4 enhancement, and thus the issue has been forfeited for purposes of appeal.")

Sánchez–Arán sustains that Ex. 40 was not properly identified and the document inflamed the jury by stating a $40 million dollar loss. The summary of the Court's order is simply that the jury was instructed that the United States did not have to prove "losses"—no instruction was provided as to "actual" nor "intended losses". The bank fraud instruction did not include loss as an element. (Docket No. 1278, Instruction No. 19). Furthermore, since the Court was to perform the loss calculation at a latter date, should a verdict of guilt be entered by the jury, the parties were instructed not to discuss losses in their final arguments. The parties complied and no defendant objected. Finally, the Indictment that went into the jury room, at the request of counsel Pasano, was redacted by the expungement of any and all "loss language" (Docket No. 1524, p. 104) **Hence, the matter of loss was outside the calculous of the jury.** It is evident that the intent of all parties was that the loss and other sentencing issues would be outside the jury calculous and within the domain of the court.

Furthermore, the Court estimated the loss at around $20 million which is anyway a large number. The Court notes that pursuant to the Guidelines applicable to the instant case, the Guidelines of November 1, 1987, the highest number as to loss to be used is $5 million dollars; (Under Guideline Section 2F.1(b)(1)(L) of the November 1, 1987 Guidelines, the loss calculation therefore caps at $5 millions). Notwithstanding, the Court was permitted, by application Note 10 of U.S.S.G. 2F1.1 to upward depart. "The adjustments for loss do not distinguish frauds involving losses greater than $5,000,000.00. Departure

above the applicable guideline may be warranted [but only to the then statutory maximum of five years] if the loss substantially exceeds that amount." The Court did not depart on the guideline counts but imposed a maximum of five years as to the non-guideline counts.[21] (See generally *Opinion and Order* of December 12, 2003, Docket No. 1442.)

The evidence as to losses as to both Sánchez–Arán and Gutierrez is overwhelming. See *Sentencing Opinion and Order,* (Docket No. 1502, p. 3–6) including the corresponding references to the record, citations of witnesses, and references to specific parts of the record contained also at the Opinion and Order as to Rule 29 dated February 6, 2003, (Docket No. 1339, p. 5–8 and 10–12).[22] The Court relates again but a few examples of the overwhelming evidence as to losses as to those two defendants:

### a. Loss–Modules Loans

**Villa Alba**—Loan date July 1985. $1.1 million (Ex. 1(d), D. 1502)

$231,000 disbursed prior to closing without Board authority.

$66, paid in construction certificates for work ((foundations) not done.

$297,000.00 attributed to Muñoz/Sánchez–Aran.

***Los Caciques Project***—July 1985 $6.8 million dollar loan (Ex. 1(e), D. 1502).

$603,000 paid to Modules for work not done.

$1,205,000 disbursed to pay other Gutierrez loans.

$1,868,000 attributed to Muñoz/Sánchez–Aran.

---

**21.** Defendants are eligible for parole after one year under the non-guideline counts of misapplication, Counts V–VII.

**22.** See also calculation of loss per project made at Docket No. 1502, Ex.I(a)-I(g) and II(a)-II(m) of said opinion as amended in Docket No. 1516 (Errata as to Docket No. 1502) (Docket No. 1516).

*Los Mameyes Project*—November 1985–November 1986. $2.8 million loan. Loan never presented to Board of Directors

Loan performance

$1.2 loan disbursed by local P.R. Housing Authority (CRUV) to pay houses and Modules never paid [that amount] to bank. [Notwithstanding having received said payment from the government housing authority]

$266,000.00 used to pay other loans of Gutierrez.

$595,000.00 used to pay for other Gutierrez commercial loan.

Total loss: $2.8 million (no Board approval).

*Cerrovista Project*—Loan to Modules Contractor September 1986 $8.9 million loan (Ex. I(g), D. 1502).

$932,177 disbursed without Board authority to pay unrelated Gutierrez loans.

$157,500 were disbursed in November 1986 for pre-manufacturing expenses for work not undertaken.

$751,500 disbursed in December 1986 for pre-manufacturing expenses for work not undertaken.

$1,841,177 $1,412,177 authorized for land purchase when actual cost was $480,000.00.[23]

The loss (misrepresentation) is therefore around $932,177.00 (disbursed to unrelated Gutierrez loans.)

Total loss $1,841.177 attributed to Muñoz–Franco/Sánchez–Aran.

Total loss Gutierrez/Modules loans $6.9 million. The amount excludes loans entered prior to October 12, 1984 that were refinanced after October 12, 1984 wherein there was fraudulent activity financing Modules, favoring Modules or to third parties all approved by Sánchez–Aran with knowledge by Muñoz–Franco.

The Court recognizes that three projects were pre October 12, 1984–La Marina, Levittown Plaza, and Quintas de Country Club, (Ex. 1(a)(b)(c)) of Docket No. 1502). La Marina Project was left, by Transglobe a Gutierrez Corporation, with a deficit of $717,000.00. **The debt was refinanced after October 12, 1984.** A $3.3 million dollar loan was granted to co-conspirator Domínguez–Wolf (deceased) he only had an equity of $22,000.00 for this subcontracted loan and all other loans herein described granted to him. The Board was not advised that Transglobe with Module houses was retained as the contractor in the new phase, notwithstanding its initial failure. Further, the Board was not advised that the construction would be delayed for months because the manufacturing plant of Modules was located at the site of the housing project. Finally, La Marina Project was acquired by an investor group of which Ariel Gutierrez was a member. The net result at the end of the refinanced project constituted yet another loss for the bank of $1.1 million. Muñoz–Franco and Sánchez–Arán were responsible for not properly advising the Board as to Domínguez–Wolf's precarious financial position and as to maintaining Modules, as the manufacturer of the houses, notwithstanding its past non-complying performance with the Bank.

In spite of the aforementioned, **the Court did not figure this $1.1 million loss at sentencing** because it was beyond the cap of $5 million established at the November 1, 1987 Guidelines, § 2F1.(a)(1)(L). Further, **the Court did not count the $717,000.00 loss** attributable to Gutierrez although there was evidence that he remained having some control of Transglobe. In order for the jury to properly comprehend this refinanced project some evidence was admitted by the

23. The original Ex. I(g) wrongly states the values of the land at only $78,790.17.

Court of pre-October 12, 1984 facts. However, there was a $3.3 million dollar loan granted without proper disclosure to the Board of the Bank as to the remaining in the project as the manufacturer of the houses post-October 12, 1984 (the date of the enactment of the law) and as to the fact that the project, post-October 12, 1984, would be considerably delayed because the Modules Manufacturing plant was to remain for several months at the construction site.

An exact replica occurred as to the loan of the Levittown Plaza Project originally entered in January 1981 wherein a $5.3 loan was granted to Transglobe. (Ex. I(b) of Docket No. 1502). By October on 1984, the project had failed leaving a $3.3 million dollar negative balance in the bank books. Again, co-conspirator Domínguez–Wolf was granted, post October 12, 1984, a $5.2 million dollar loan, with an equity of only $22,000.00. Again, Modules was kept as the housing subcontractor as to the Modular houses notwithstanding its past failure in the same project. The Board was not advised of this critical fact. This refinancing and the subsequent disbursements occurred post-October 12, 1984. The Dow loan phase (Domínguez–Wolf) was presented by Sánchez–Arán and MuñozFranco to the Board of Directors. The Board was not advised of the fact that Modules would be retained as housing subcontractor nor was the Board informed as to Domínguez–Wolf's precarious financial status.

In sum, $229,000.00 were subsequently paid to Modules for work never undertaken. Seventy-three houses that were to be built by Modules **were never constructed.** Domínguez–Wolf eventually finished the project using conventional houses (not modular houses), seven years behind schedule. An overall loss was eventually carried by the bank after the refinancing to Domínguez–Wolf. The entire loss of $3.1 million can be attributed to co-defen-

dants Muñoz–Franco and Sánchez–Arán due to their failure to properly inform the Board as to retaining Transglobe as housing subcontractor (the *United States v. Stedman* doctrine, p. 20 infra) and their failure to advise the Board as to Domínguez–Wolf's precarious financial situation. Again, **the Court did not use this $3.1 million loss to upward depart** but the amount can be used to increase the loss suffered by the bank. Background pre-October 12, 1984 facts was presented to the jury to show the precarious status of the project when Dow (Domínguez–Wolf) was granted a $5.2 million dollar refinanced loan post October 12, 1984.

An almost replica factual scenario occurred with the loan for $3.6 million for Quintas de Country Club project granted to Transglobe in March 1982, (Ex. I(c)) of Docket 1502). By October 1984, a $2.3 million deficit, left by Transglobe, remained in the bank books. The deficit was created because Modules never constructed a single house although it received $214,000.00 in construction certificate payments and an additional $60,000.00 was used to repay other Gutierrez's loans. The Transglobe balance was satisfied by a loan to Dow Group III owed by co-conspirator Domínguez–Wolf, again only with an equity of only $20,000.00. Transglobe and the Modules houses were again kept as the housing builders notwithstanding its utter failure to construct a single unit prior thereto. The Board of the Caguas Bank one more time, was not advised as to this critical fact. Nor was the Board advised as to the precarious Domínguez–Wolf's financial condition for loans of this magnitude. The loan application was presented to the Board by Muñoz–Franco and Sánchez–Arán. Only twenty-two (22) of fifty-four (54) houses were eventually built by Transglobe. An overall loss of $2.9 million was sustained by the bank as to the refinanced Gutierrez's loan. The loss of $2.9

million can be attributed to Muñoz–Franco and Sánchez–Arán because of their failure to properly advised the Board as to critical facts anent Transglobe and/or Domínguez–Wolf. Notwithstanding, **the Court did not use the $2.9 million dollar loss to upward depart as to Muñoz/Sánchez–Aran,** as authorized by the Guidelines of November 1, 1987, although it was another additional loss, increasing the losses of the bank caused by Sánchez–Arán and Muñoz–Franco. The total loss for the three projects was $7.1 million dollars. **The total loss after October 12, 1984 relating to Gutierrez's loans was $14.0 million dollars.** Again, the jury was informed of the pre-October 12, 1984 facts to properly comprehend the post October 12, 1984 refinancing facts.

### b. Loss–Mirandes' Loans

**Villas del Gurabo Project.** On July 1985, a loan was granted to the Mirandes' Corporation for $1.8 million(Ex. II 9(c), Docket No. 1502; 1517). Between November 1985 to August 1987, $100,000.00 were disbursed, under this loan, for other past Mirandes loans. $80,000.00 were additionally disbursed under this loan to pay expenses of other projects. The loan was increased for $260,873 without the Board's authorization. In regards with this project, a total of $440,873.00, as loss, is attributed to Muñoz–Franco and Sánchez–Aran.

**Jardines de Bubao I Project.** (Ex. II(d), D. 1502; 1517). A loan was granted in December 1984 for $516,000.00. On December 1984, $25,000.00 were disbursed, under this loan, to pay Reparto Villanueva Project. On December 1984, $500,000.00, from this loan, were used to pay other Mirandes' loans to the bank. In regards with this project, a total loss of $525,000.00 is attributable to Muñoz–Franco and Sánchez–Arán.

**Jardines de Bubao II Project.** (Ex. II(e), D. 1502; 1517). On April 2, 1985, a loan was granted for $860,000.00. Between July 18, 1985 to July 19, 1988, $478,000.00 were disbursed, under this loan, to pay for other Mirandes' loans to the Caguas Bank. $85,000.00 were disbursed, from this loan, to pay expenses of other projects. In regards with this project, a total loss of $563,500,00.00 is attributable to Muñoz–Franco and Sánchez–Arán.

**Extension Marisol Project.** (Ex. II(f), D. 1502; 1517). On December.1984, a $1.7 million dollar loan was granted. '$46,000.00 were disbursed to pay expenses for other projects. In regards with this project, the total loss attributable to Muñoz–Franco and Sánchez–Aran is $46,000.00.

**Las Colinas I Project.** (Ex. II(g), D. 1502; 1517). On July 1985, a loan for $800,000.00 was granted by the Bank. $103,000.00, out of this loan, were disbursed for other Mirandes' loans $7,000.00, from this loan, were used to pay expenses of other projects. In regards with this project a total loss of $110,000.00 is attributable to Muñoz–Franco and Sánchez–Arán.

**Las Colinas II Project.** (Ex. II(h), D. 1502; 1517). In November 1985, a loan for $2.3 million dollar was granted by the Bank. $400,000.00, from this loan, were disbursed to pay other Mirandes' loans. $165,000.00, from this loan, were disbursed to pay expenses for other projects. In regards with this project, a total loss of $565,000.00 is attributed to Muñoz–Franco and Sánchez–Arán.

**Valle Piedras Project.** (Ex. II(I), D. 1502; 1517.) A loan for $4.6 million was granted by the Bank in June 1986. $1,000,000.00 in interest were wrongfully capitalized. $600,000.00 was taken in the Caguas financial books as excess of approved reserve interest. $185,000.00 were disbursed to pay expenses of other projects. In regards with this project the

48

total loss attributed to Muñoz–Franco and Sánchez–Arán amounts to $785,000.00.

**Paseo Juanita Project.** (Ex. II(j), D. 1502; 1517.) In August 1986, a loan for $900,000 was granted by the Bank. $93,400.00 from this loan were disbursed to pay for expenses of other projects. In regards with this project, the total loss attributed to Muñoz–Franco and Sánchez–Aran is of $93,400.00.

**Villa Juanita Project.** (Ex. II(k), D. 1502; 1517.) In August 1986, a loan for $1.1 million was granted by the Bank. $160,000.00 were capitalized in interest. $121,000.00 excess in interest reserve was unduly taken in the book of the bank. $162,000.00 were disbursed from this loan to pay expenses of other Mirandes' projects. The total loss attributed to Muñoz–Franco Sánchez–Aran amounts to $283,000.00.

**Vista del Atlántico II Project.** (Ex. II(L), D. 1502; 1517.) A loan for $1.6 million was granted by the Bank. $55,000.00 from this loan, were disbursed to pay other Mirandes' loan. $200,000.00 were disbursed to pay expenses of other Mirandes' projects. A total loss of $255,000.00 is attributed to Muñoz–Franco and Sánchez–Arán.

**Valle Bello Project.** (Ex. II(m), D. 1502; 1517.) On August 1986, a loan for $3.4 million was granted by the Bank. A $525,000.00 unauthorized increase was granted without Board approval. $20,000.00, from this loan, were disbursed

to pay other Mirandes' loans. $1,360 were disbursed to pay expenses of other projects. In regards with this project, a total loss of $1,905,600.00 is attributed to Muñoz–Franco and Sánchez–Arán.[24]

In sum, the total loss as to the Mirandes' loans attributable to Muñoz–Franco and Sánchez–Arán amounts to $5,139,300.00. The total loss as to the Mirandes' loans added to the total loss as to the Gutierrez's loans of $14.0 million amounts to a total loss of $19.1 million.[25]

■ Co-defendant Sánchez–Arán's assertion that Ex. 40 inflamed the jury and altered the verdict simply flies against the teeth of the strong wind of the record. As stated before, the Court at Instruction Number 13 advised the jury that the United States did not have to prove "actual loss as a result of the scheme". Further, Instruction No. 13, relating to bank fraud required only three elements none of which required loss. Finally, the Court required all counsel not to argue about loss to the jury since the Court was to decide the matter later (since no request had been made by counsel that this matter was to be determined by the jury). All attorneys followed the Court's request, none lodged any objection. Not only was there no objection as to the fact that loss would not be mentioned, (see Docket No. 1524 Tr. of Objections to the Instructions, p. 59–122) but also counsel Pasano, representing Ariel Gutierrez, requested that the indict-

24. The court recognizes that two loans as to Mirandes were permitted to be discussed before the jury were granted prior to October 12, 1984. In Reparto Valenciano the closing occurred on May 1984, the money was disbursed prior to closing, also the loan was increased without Board approval showing a pattern of conduct and a preferential treatment similar to the Gutierrez's loans. Further in the Villas del Gurabo project a loan for $828,000.00 approved on August 1983. $90,000.00 was used to pay for other loans.

Again showing a pattern of preferential treatment and a pattern of using funds destined for a particular construction project yet used to satisfy the economic needs of other prior construction projects.

25. The court stresses that in no minutes of the bank's Board of Directors, nor in any bank document, there is any language that any of the loans described herein constituted "work out" loans, except as to Cerrovista loan object of the misapplication Counts V–VII.

ment sent by the Court to the jury room should not have any "loss language" in the redacted indictment form. (Docket No. 1524, p 104.) The Court complied. Hence, the jury did not hear arguments as to loss in any of the four days of final and rebuttal arguments, (Docket Nos. 1268, 1269, 1273, 1274, 1275), and received no "loss language" in the indictment.

■ As the Court thoroughly explained at the order as to acquittal or new trial, (Docket No. 1528, p. 2–9, Addendum No. 1 to this Opinion and Order), the entire matter, even if wrongly accepted into evidence is, therefore, a harmless error under the doctrine of *United States v. Innamorati*, 996 F.2d 456, 475 (1st Cir.1993). Basically, this case is one of "overwhelming" evidence of guilt rather that a case of "scarcity of evidence of guilt" under the case of *United States v. Aguilar–Aranceta*, 58 F.3d 796, 802 (1st Cir.1995). See Docket Nos. 1339, 1528, 1442 and *Order as to Downward Departure Requests* (Docket No. 1520). Accordingly, the Court rejects co-defendant's assertion that the matter of Ex. 40 is a "close question" under *United States v. Bayko*, 774 F.2d at 522.

## 4. EX POST FACTO ISSUE

■ Co-defendant Sánchez–Arán raises, for the first time, lack of an ex-post-facto instruction. The co-defendant alleges for the first time that the Court should have provided an instruction that the defendants could not be convicted on evidence prior to October 12, 1984. This evidentiary matter refers to the evidence as to two Mirandes' loans and three Gutierrez's loans that showed a pattern of conduct

which was repeated later in numerous other loans post-October 12, 1984 (eleven Mirandes' loans and five Gutierrez's loans).[26] The three Gutierrez's pre October 12, 1984 loans had conduct that constituted fraud after the refinancing occurred post October 12, 1984. The two Mirandes' pre October 12, 1984 loans had principal and or interest payments into them satisfied by fraud from other post October 1984 Mirandes' loans. Further, the matter may have been properly brought as background evidence of the pattern of preferential treatment received by Mirandes and/or to the Gutierrez corporations.

As to the three refinanced Gutierrez's loans, in order to comprehend the post October 12, 1984, fraudulent conduct, the jury received evidence as to how the deficit of the loans was achieved prior to the refinancing of the construction project post October 12, 1984. The Court, at this time, does not recall if counsel objected originally, nor if a limiting instruction was contemporaneously requested when the evidence was being received. **The court, however, can assert that no defendant timely requested prior to jury deliberation, after the court read the instructions, an instruction that defendants could not be convicted for any pre October 12, 1984 fact.** See Docket No. 1524 (objections to the jury instructions).[27] *United States v. Bayko*, 774 F.2d at 517–518 teaches that ex-post-facto arguments may not be raised for the first time on appeal, the matter being subject to harmless error analysis.[28]

Since there was plenty of evidence as to a fraud of around $20 million dollars, any

26. "Having failed to raise the ex-part-facto argument below, defendant may not raise it on appeal (Motion for Bail on Appeal)." *United States v. Bayko*, 774 F.2d 516 (citations omitted.)

27. Objection to instructions by counsel after jury received instructions.

28. Exceptions do exists, *United States v. Bayko*, Id., but do not apply in this case where there is unrebutable evidence as to millions of dollars being used from one loan to pay other loans giving the impression that the loan receiving the moneys is current when in reality it is in default.

illegality in the five loans pre October 12, 1984,[29] and any quantity therein mentioned becomes harmless error due to the overwhelming evidence of guilt and of a fraud presented amounting to around $20 million dollars regarding events past October 12, 1984. Further, since defendants failed to request a limiting instruction after the charge, they waived the matter.[30] *United States v. Mendoza–Acevedo,* 950 F.2d 1, 4 (1st Cir.1991).

Finally, as part of the ex-post-facto analysis defendants allege that there is doubt as to coverage under the November 1, 1987 Guidelines. This matter is fully covered by the court at Docket 1442, p. 13–20. The matter is not "close." The Court briefly recapitulates.

The general rule in this Circuit is that "it is well established that the guidelines apply to defendants whose offense begins before the guidelines effective dates and continues after the effect date." *United States v. David,* 940 F.2d 722, 739 (1st Cir.1991). The Court must determine the relevant dates for the charged conduct, *United States v. Bennett,* 37 F.3d 687 (1st Cir.1994). As to the Mirandes' loans, the Court simply reiterates, as to Muñoz–Franco and Sánchez–Arán (Counts II and IV), that $440,000.00 were disbursed from the Villas del Gurabo II loan proceeds without Board authority, ($260,000.00); $100,000.00 were used to pay for other Mirandes' loans and $80,000.00 were disbursed to pay for expenses of other construction projects. In the Jardines de Bubao I project $500,000.00 were disbursed for other expenses of the projects; in the Valle Bello project $1.36 million were disbursed without proper Board authority

and the loan was increased for $525,000.00 without authority, all occurring after November 1987. Other disbursements in the Mirandes' loans arrive easily at the $5 million threshold. As to Counts I and III related to the Gutierrez's loans, the Court looks to Ex. 186 of January 10, 1988 (the Denby letter) the misrepresentation, made by Sánchez–Arán and Muñoz–Franco, covering up the Gutierrez's loans and the actions of co-defendants Gutierrez and Umpierre all of which drag easily into the Guidelines November 1, 1987 coverage. (See generally D. 1415. The government's detailed analysis requesting the court to use the 1989 version, not merely the 1987 version, of the Guidelines, containing all relevant facts as to each defendant occurring after November 1987, the date of the original Guidelines.) This matter is, therefore, "not close" pursuant to the *United States v. Bayko* rule. (The court determined 1987 coverage and considered 1989 coverage under the Guidelines deminimis.)

### 5. SUFFICIENCY OF EVIDENCE AND FORGERY INSTRUCTION.

█ Co-defendant Sánchez–Aran alleges two additional issues at Docket No. 1590, (*Motion for Release Pending Appeal*) as to insufficiency of evidence relating to intent to deceive (p. 5–7) and lack of an instruction as to forgery (p. 7). As to the matter of insufficiency of evidence regarding intent to deceive, the Court has reproduced in this Opinion evidence as to: (1)the conduct of Dr. Sánchez–Arán through his participation in the Denby letter, as to knowingly signing false construction certificates, not advising the board

---

**29.** Three of these loans formerly of Transglobe were refinanced. However, as discussed infra the fleecing of the Bank continued after refinancing of the loans.

**30.** Defendants allege that "Dr. Sánchez–Aran respectfully submits that the failure to instruct the jury that it could convict on bank fraud only if it found that the acts were committed after October 12, 1984 presents a substantial issue on appeal." The problem is that he failed to request said instruction and hence waived the matter,(D.1524, p. 55–105).

properly as to failure of Modules and omitting, from the Board of Directors, proper financial information to Modules and said company's continued participation in refinanced projects; (2) omitting from regulators as to the practice of the bank of paying principal and interest in non complying loans through new unrelated loans and; (3) not properly reporting the Modules loans as losses. The matter of sufficiency of evidence is not "close" within the holding of *United States v. Bayko*, 774 F.2d at 521, 522.

Further as to the forged checks matter, these facts occurred within the refinanced Gutierrez's loans object of the complaint. The forged signatures were related to disbursement issued by the bank to the suppliers and/or the refinanced general contractors who stated that they never received the checks. The general contractors/suppliers simply stated, that those were not their signatures in the checks drawn, which also included as payees Modules related companies.

As to the forgery instruction, the matter is subject to "harmless error" analysis since there was abundant evidence as to other fraud evidence committed by Dr. Sánchez Arán throughout the conspiracy. Second, the party failed to timely properly request the proper instruction at the end of the charge (Docket 1524, p. 59–64). *United States v. Mendoza–Acevedo*, 950 F.2d at 4. Hence, the matter as to the forgery instruction, there being no objection after the end of the charge, (D.1524), is deemed waived and "not close" within the *Bayko* requirements 774 F.2d at 522–523.

## 6. QUESTIONS BY THE JUDGE

Finally, co defendant Sánchez Aran challenges a question made to the expert witness of co-defendant, Tomás Meyers. Defendants challenge that the judge asked how could the Board of Directors know that these loans (the loans subject to the indictment) were "workout loans" since the loan documents did not reflect that specific nature.

The court in its Rule 29 Opinion and Order covered this issue.

The Government, in their response (Docket No. 1322), is quick to correctly point out that the Court has a right to ask questions during a trial. In fact, the "district court has the undisputed right to question witnesses at trial." *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 352 (1st Cir.), cert. denied, 525 U.S. 932, 119 S.Ct. 341, 142 L.Ed.2d 281 (1998) *citing United States v. Henry*, 136 F.3d 12 (1st Cir.1998).

Utilizing the Defendant's own recount of the Court's questioning (as no reference whatsoever is made), no unfair prejudice was manifest. The Court's question did not suggest or indicate any particular opinion regarding the case or any specific matter. Defendant reads too much into the single question. By inquiring as to how one would know if a loan was a "workout," no representations were made as to the weight of previous testimony, no suggestions were made to the jury to disregard prior evidence, and no voice was given to any opinion regarding the matter. The question was aimed at understanding the witness' testimony. Neither the goal or effect of the question was to add any weight to the prosecution's case. In fact, only the answer to the Court's question may have had any actual effect.

The Court was also careful to provide the following jury instruction so that no prejudice would be caused by any questions asked by the Court during the course of the trial:

> During the course of trial, I occasionally ask questions of a witness, in order to bring out facts not then fully

covered in the testimony. Do not assume that I hold any opinion on the matters to which my questions are related. Remember at all times that you, as jurors, are at liberty to disregard all comments of the Court in arriving at your own findings as to the facts.

Jury Instruction No. 10 (Docket No. 1278).

The. Defendant's allegations of improper questioning boil down to a simple, non-leading question which was accompanied by a clear instruction to the jury that they may completely disregard any of the Court's comments regarding the facts of the case. Because no unfair prejudice was created as a result of the Court's questioning of the witness, the Defendants' Motion for Acquittal on this matter is denied.

The question was neutral, non leading, and in a one hundred sixty-eight-day trial could hardly have any significant negative result specially since the court recalls that the expert considered the court's questions as "an excellent question."

The alleged error was not made and can hardly be considered a "close question" of law under the *Bayko* threshold.

## B. WILFREDO UMPIERRE HERNANDEZ .

Co-defendant, Wilfredo Umpierre Hernández, has also filed various submittals requesting bail on appeal. *Motion for Bail Pending Appeal* (Docket No.1596). *Second Motion for Bail Pending Appeal (amended)* (Docket No.1599); *Second Motion for Bail Pending Appeal (second amended)*, (Docket No. 1601). Finally, co-defendant filed a motion entitled *Urgent Motion for Stay of Sentence Pending Appeal, Alternate Request for Extension of Time to Self–Surrender*, (Docket No. 1631).

## 1. BLAKELY ISSUES

Co-defendant Umpierre alleges a claim under *Blakely v. Washington*, 542 U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), in that the sentencing enhancement factors should have been decided by the jury. The short answer is that since defendant failed to request the matter after instructions were provided, during trial, and/or at sentencing he has waived the right. *United States v. Nelson–Rodríguez*, 319 F.3d at 47; *United States v. Savarese*, 385 F.3d at 21–22; *United States v. Morgan*, 384 F.3d at 7–8 (1st Cir.2004) (also subject to "prudential doctrines" analysis under *United States v. Booker*, 543 U.S. ——, 125 S.Ct. 738, —— L.Ed.2d —— (2005), specifically meaning "plain error" analysis).

## 2. MINIMAL PARTICIPATION REQUEST

Co-defendant's second argument is that the Court should have granted him a "minimal" participation role under the United States Guidelines instead of a "minor" participation all under U.S.S.G. 3b.1.7. This matter is not subject to the holding of *Blakely v. Washington* since the holding excludes the trial judge determining mitigating factors. *Blakely v. Washington*, 542 U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 citing *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) 1986 (not applicable to a sentencing scheme involving minimum standards).

Defendant Umpierre attacks the decision of the court to deny a minimal role adjustment on two grounds. First, co-defendant alleges that the United States did not object to the recommendation and second defendant alleges that he nevertheless warrants the granting of the minimal role. The Court strongly disagrees on both counts.

■ The Court listened patiently through a trial for eighteen months and heard all the aggravating and mitigating factors within the evidence. As to the fact that the recommendation was made in the pre sentence report the court reminds the parties that the PSR does not bind the Court. *United States v. Nelson–Rodriguez*, 319 F.3d at 62–63 "as the district court noted **the report [PSR] is only a recommendation to the court; the court is not bound to accept these recommendations.**" (Emphasis ours.) See also *United States v. Caribe Garcia*, 125 F.Supp.2d 18, 21 (D.P.R.2000) "A pre-sentence report contains a sentencing **recommendation.** The court is, of course, not bound to follow what the probation officer advises in his report." (Emphasis in the original opinion.)

As to the merits, determinations as to role in the offense are "almost always fact bound ... the defendant bears the burden ... (citations omitted) ... appellate review is highly differential ..." *United States v. González*, 363 F.3d 15, 18 (1st Cir.2004), citing *United States v. Ocasio*, 914 F.2d 330, 332–33 (1st Cir.1990); *United States v. Graciani*, 61 F.3d 70, 75 (1st Cir.1995). See also *United States v. Sánchez*, 354 F.3d 70, 74–75 (1st Cir.2004).

■ The Court granted co-defendant Umpierre a minor role adjustment but declined to grant a minimal role adjustment. The Court grants that co-defendant Umpierre is "substantially less culpable than the average participant." USSG 3B1.2 (N. 3(A)). The Court finds that he performed a "limited function" similar to that of "a defendant who is convicted of a drug trafficking offense whose role in that offense was limited to transporting or storing drugs ..." USSG 3B1.2. (No. 3(A)). However, co-defendant Umpierre fails to qualify for a minimal participation. The participation warranting a minimal role mitigation is that the defendant must be the "least culpable" but the defendant "must lack knowledge or understanding of the scope and structure of the enterprise and the activity of others." USSG 3B1.2 (N. 3(c)). The defendant falls short of this required threshold. The court briefly explains.

Co-defendant Umpierre participated in delivery and signing of dozens of false construction certificates knowing that the certificates were deficient and that the work had not been performed. Further and most critical, when the Gutierrez brothers corporations terminated as general contractors, because of non-compliance, Umpierre dedicated himself to the finding of successor general contractors to continue the failed construction projects using Modular pre-fabricated houses. Normally these actions would constitute clearly a mitigating role. For example, co-defendant found, for the Gutierrez and the Caguas Bank, general contractor John Burns, who was granted a $8.9 million dollar loan in one week, and developer Montilla, who had been three times rejected prior thereto by the bank but who, in a month, received a loan, for the Jardines de Villa Alba project, in the amount of $1,000,000.00 (One million dollars). The problem, however, was that the fleecing of the bank by the conspirators continued (Gutierrez, Muñoz Franco and Sánchez–Aran) this time using Burns and Montilla as victims. The proceeds of the loan were deviated directly to Modules to repay other past loans without knowledge of Burns/Montilla; the money not being invested in the refinanced construction project and causing subsequential loss to the project since the monies were not used in the construction project.

## 3. DOWNWARD DEPARTURE ERROR

Co-defendant Umpierre also alleges error by the Court in refusing to downward

depart under the "discouraged ground" of "family ties and responsibilities ..." USSG Ch.5 Pt. H., USSG 5H.1.6. "Family ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the guidelines" (Policy Statement Id.). The Court declined to downward depart in its *Order as to Downward Departure Request* dated March 1, 2004 and entered March 3, 2004, (Docket No. 1520). The Court understood the downward departure request and discretionarily declined based on the case of *United States v. Pereira*, 272 F.3d 76 (1st Cir.2001) and the cases cited therein by the Court of Appeals. The appellate rule is simple: "a sentencing court's discretionary refusal to depart is unreviewable." *United States v. Sánchez*, 354 F.3d at 76 citing *United States v. Teeter*, 257 F.3d 14, 30 (1st Cir.2001); *United States v. Pierro*, 32 F.3d 611, 619 (1st Cir.1994). The matter is, hence, not a "close" matter of law as required.

### 4. ALLEN CHARGE

Wilfredo Umpierre has further alleged as an error by the Court the issuance of an alleged Allen Charge. The matter is fully covered in the Court's resolution of the Rule 29 multiple motions (Docket No. 1339, p. 54–58). The matter is reproduced in its entirety for the convenience of the reader:

Before the jury began deliberation in this case, the following instruction was read informing the jury that they were not constrained by time in any way:

The Court: All right ladies and gentlemen of the jury now the case is yours. From now on nobody has a stopwatch on to see how long it's going to take you to [deliberate]. It's going to take you how long it takes. If its [sic] today, today, tomorrow, tomorrow or Wednesday, it's Wednesday, Thursday, Friday or whatever. We shall wait until whatever time it

takes the Honorable Ladies and Gentlemen of the jury the time to accomplish it's oath and it's duty. Thank you very much. The evidence will now all go into your room.

The jury was further advised only to deliberate when all of the jurors were present. They were instructed to inform the Court in the morning that all jurors were present and deliberation had begun and in the evening that deliberation had concluded for the day.

At 3:30 P.M. on May 13, 2002, the jury began deliberation. At 5:10 P.M. on May 13, 2002 the jury informed the Court via jury note of the following: "By this means we wish to inform the Court that we will be working from 9:00 am to 5:00 pm, until we reach verdict." Jury Note 2 (Docket No. 1279a). At 9:48 A.M. on May 14, 2002 a jury note was submitted to the Court pursuant to the Court's instruction which read, "We began deliberating at 9:30 am Tuesday (5/14/02)." Jury Note 3 (Docket No. 1281). At 4:40 P.M. on May 14, 2002 a jury note was submitted to the Court stating, "We are concluding for today." Jury Note 5 (Docket No. 1281b). At 9:20 A.M. on May 15, 2002 a jury note was submitted to the Court stating, "We are starting for the day. It is now 9:21 am." Jury Note 6 (Docket No. 1283). At 5:00 P.M. on May 15, 2002 a jury note was submitted to the Court stating, "We are concluding for today." Jury Note 8 (Docket No. 1283b). At 10:12 A.M. on May 16, 2002 a jury note was submitted to the Court stating, "We are now starting for the day." Jury Note 9 (Docket No. 1286). At 5:00 P.M. on May 16, 2002 a jury note was submitted to the Court stating, "We are concluding for the day." Jury Note 10 (Docket No. 1286a). At 9:35 A.M. on May 17, 2002 a jury note was submitted to the Court stating, "We started at 9:25 am." Jury

Note 11 (Docket No. 1290). Then, instead of informing the Court that deliberations had been concluded for May 17, 2002, on or around 5:00 P.M., the jury submitted to the Court the following jury note:

> Judge Dominguez, At this point we do not know when a veredict [sic] will be available for the court. We are considering to work today until some time after 5:00 PM, and to come back on Tuesday, May 21?

Jury Note 12 (Docket No. 1290a).

A plain reading of this jury note can only conclude that the jury wished to continue working toward a verdict past 5:00 P.M. and then to return on Tuesday May 21, 2002. There is no evidence from the note that a deadlock had been reached or any other impediment had arisen which would preclude this jury from reaching a verdict. Rather than informing the Court of a deadlock, they are informing the Court that continued deliberation is needed into the night and to resume the following Tuesday. In light of the Court's instruction that the jury indicate when they were concluded for the day, the Court justifiably and correctly read the jury's note as a simple request to work past 5:00 P.M. Rather than leave for the night [at 5:00 pm], the jury wanted to work longer. The Court informed the parties of the jury's note and responded with the following note:

> The court prefers that the jury make an effort to reach a verdict and hence requests the jury to continue to make efforts today *as you indicate.*

> *See* Jury Note 12 (Docket No. 1290a) (*emphasis added*).

The Court simply informed the jury that they were free to deliberate past 5:00 P.M. **as they requested.** (Originally the jury had stated they preferred to work from 9:00 A.M. to 5:00 P.M. (Docket No. 1279a)) Nothing more should be read into the Court's note as is visible from a plain reading of the jury's note and the Court's response.

Originally the Court indicated that the jury could continue to makes efforts past 5:00 P.M. and on Saturday. This original reference to deliberations on Saturday [on this date] was made because the Court was mindful of impending graduations of the jurors' children to be attended by a few jurors which had previously been scheduled and would potentially postpone the deliberation in the case from May 20, 2002 to June 8, 2002. Jury Note of April 1, 2002.[31] Defense counsel Anduze argued that the inclusion of an option for Saturday should be stricken. Assistant United States Attorney Maria Dominguez argued that at the request of Defendant's counsel Anduze, the jury had worked the prior Saturday to receive evidence from Defendant's expert. Docket No. 1289. The Court struck the word "Saturday" and "5 PM," submitting the instruction to the jury as it reads above. Then at 8:55 P.M. the jury submitted the following note to the Court, "We have reached a unanimous verdict. We are ready to hand over the verdict." Jury Note 13 (Docket No. 1290b).

Defendants now argue the Court's response to the jury note seeking to work past 5:00 P.M. should be construed as a "directive" to the jury to "reach a verdict within a short period of time." Motion for Judgment of Acquittal Under

---

31. In 2001, the prior year, a similar request had been made by the jury regarding graduation ceremonies. *See* Jury Note of May 8, 2001. The trial was postponed during May 23, 2001 and May 24, 2001 for said graduations. Trial Transcript of May 8, 2001, p. 2 (Docket No. 944).

F.R.Crim.P. 29(c), p. 14 (Docket No. 1307). The Court merely directed the jury to work toward a verdict *as they requested* ("as you indicate"), no period of time was imposed on the jury.

Defendants further argue that the Court failed to properly communicate to the jury its right to fail to agree pursuant to *United States v. Paniagua–Ramos,* 135 F.3d 193, 197–198 (1st Cir. 1998) as well as the fact that the burden remained with the government pursuant to *United States. v. Manning,* 79 F.3d 212, 222 (1st Cir.1996). Without explicitly saying as much, Defendants seem to believe the Court's response was in fact an Allen [32] charge and caused the jury to return to a guilty verdict, prejudicing the Defendants.

The Court is aware of the First Circuit's rulings requiring Allen charges to include the three specific elements of *Paniagua–Ramos* and *United States v. Manning,* 79 F.3d 212, 222 (1st Cir. 1996) ("A district court should instruct jurors in substance that (1) members of both the majority and the minority should reexamine their positions, (2) a jury has the right to fail to agree, and (3) the burden of proving guilt beyond a reasonable doubt remains with the government"). However, the First Circuit has been equally clear that "whenever a *jury first informs the court that it is deadlocked,* any supplemental instruction which urges the jury to return to its deliberations must include the three balancing elements." *United States v. Angiulo,* 485 F.2d 37, 40 (1st Cir.1973) (*emphasis added*). No Allen charge analysis is necessary in this case and the three specific elements needed not be addressed because **the Court's response was not an Allen charge** or any other derivative supplemental instruction aimed at breaking a deadlock or given

after being informed of an impasse. Instead, the Court's response simply indicated to the jury that they were free to work "as you indicate" in the jury note. The Court's note was merely a response to their question to work past 5:00 P.M. and to return on Tuesday May 21, 2002.

Other trial Courts have attempted to shed Allen charge scrutiny by claiming not to be Allen charges. In *United States v. Hernandez–Albino,* 177 F.3d 33, 38 (1st Cir.1999), the argument failed because the government claimed the instruction in response to a deadlocked jury was not an Allen charge precisely because it failed to incorporate all three elements of *Paniagua–Ramos.* As documented above, the Court's response to the jury note in this case is not an Allen charge under wholly different rationale, namely because the jury never indicated that a deadlocked status had occurred and the Court never attempted to break a deadlock. The Court merely instructed the jury to continue deliberating as the jury had indicated ("as you indicate"). [which included the twenty-first of May]

Even in cases where the jury has clearly indicated that they are deadlocked, instructions to the jury to continue deliberating, without anything more, have been upheld. *See Montoya v. Scott,* 65 F.3d 405, 410 (5th Cir.1995) ("Would you please deliberate for another 30 minutes to see if you are able to reach an answer to the special issue in accordance with the Court's instruction and please report to me after that."); *United States v. Warren,* 594 F.2d 1046, 1050 (5th Cir.1979) (noting court's instruction to jury to continue deliberating, in response to two notes suggesting jury was deadlocked, was not traditional Allen charge). The Court in this case

**32.** *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

did no more than encourage the jury to continue deliberating as they requested. Even more importantly, the **jury never indicated that a deadlock was reached,** and to this date, there is no evidence on the record that a deadlock did indeed occur. Because no deadlock was reported to the Court, no Allen charge was issued, and the Court's response to the jury note simply indicated that the jury was free to deliberate past 5:00 P.M. as they requested. No prejudice was created and Defendants have no basis for acquittal on these grounds.

After the decision of this Court as to Rule 29, (Docket No. 1339), the Circuit Court of Appeals decided the case of *United States v. Figueroa–Encarnación,* 343 F.3d 23, 32 (1st Cir.2003). In said case the Circuit Court stated (Hon. Judge Torruella writing for the panel) that the analysis must **start with a determination of a deadlocked jury followed by a dynamite charge delivered by the judge** ("dynamite charge delivered to a deadlocked jury").

There is no doubt that the note delivered to the Court is not that of a "deadlocked jury." Further, where, as here, when the judge reasonably concluded that the jury was not deadlocked in the first instant, because they were merely requesting to work that night date, "the defendant is not prejudiced by a simple instruction to continue deliberating." *Figueroa–Encarnación,* Id. Moreover, the order of the court after a deadlock jury note "must have the coercive elements of an Allen charge, it need not include the Allen cure" Id. As is the case of *Figueroa–Encarnación,* the "requisite of coercion is simply absent [in the note of the Judge]" "the court simply stated to the jury to continue 'as you indicate,' thus reversal on this ground is unwarranted."

The remaining reasons adduced by co-defendant are either discussed infra, or supra, as the Court discusses legal issues raised by other co-defendants; or the Court finds them unmeritorious and denies them.[33]

### C. ARIEL GUTIERREZ

As other co-defendants, Ariel Gutierrez has filed several motions requesting bail on appeal to wit: *Motion for New Trial and/or for Arrest of Judgment; Defendant's Ariel Gutierrez Rodriguez's Motions for Release Pending Appeal and Incorporated Memorandum of Law* (Docket No. 1462); *Supplemental Submission in Support of the Granting of Bond Pending Appeal* (Docket No. 1486); *Motion Requesting Sureties for Bond* (Docket No. 1548); *Reply on Support of Motion for Release* (Docket No. 1592); *Joinder in Pleadings Discussing Blakely* (Docket No. 1612). Defendant also filed several motions as to extensions for surrender dates. (Docket Nos. 1617 and 1629). The Court has granted all the motions requesting and extension of the surrender dates. In fact the Court had granted recently all co-defendants, should the bail on appeal be adversely decided, an extension of thirty days in which to surrender, after final resolution of bail matters.

The motion entitled *Reply in Support of Motion for Relief Pending Appeal* (Docket No. 1592) is a motion substantially discussing the proper standard to be used wherein co-defendant alleges that he is not a flight risk, which the Court concedes, and discusses the *Bayko* standard set forth at 774 F.2d 516 not requiring a certainty of reversal but merely a "close question" of law. The Court agrees with the standard urged by counsel Michael Pasano as to bail

---

**33.** The defendant has raised as final argument in a motion filed on December 20, 2004, D. 1683, that the enhancements must be decided by the jury, however, the matter is raised too late. See *United States v. Savarese,* 385 F.3d at 21.

pending appeal requiring only a "close question" of law and not mandating a reversal.

The *Motion for Joinder in Pleadings Discussing Blakely* (Docket No. 1612) is noted but discussed infra in this memorandum. No further discussion is required but the Court notes that it was precisely counsel Pasano, on behalf of co-defendant Gutierrez, who requested at the post charge conferences that no discussion of loss be made to the jury and that the indictment be redacted to exclude all "loss language". This request not only constitutes a waiver that loss be determined by the jury but also an express repudiation that the jury determine loss damages. Ariel Gutierrez cannot "have the cake and eat it too". (See Docket No. 1524 at p. 104.)

Docket No. 1486 entitled. .... *Supplemental Submission in Support of the Granting of Bond Pending Appeal* is a rediscussion of Docket No. 1592 also discussing the proper bail on appeal standard. The Court is, therefore, left with the substantive request for bail as to Ariel Gutierrez at Docket No. 1462 ... *Motion for Release Pending Appeal* ... and with the *Motion to Substitute Sureties for Bond* (Docket No. 1548).

Co-defendant alleges insufficiency of evidence. The Court refers the reader to p. 11–15 of this Opinion and to the Opinion and Order resolving the Rule 29 Motions (Docket No. 1339, p. 1–32).

Speedy trial, 5th and 6th amendment including Pre Trial Delay, errors and/or mayor trial errors are all the subject thoroughly discussed by the Court in various orders and duly recapitulated at p. 60–64 of Docket No. 1339 resolving the Rule 29 motions. These topics were the subject of numerous orders described at Docket 1339 of the undersigned judge as well as the predecessor Judge Carmen Consuelo Cerezo, who handled the case for various

years prior to transfer to the undersigned Judge.

The alleged inconsistent verdict allegations was also addressed at the Rule 29 Ruling Docket No. 1339 p. 58 –60. Briefly restating, the test is not whether or not one co-defendant was found guilty and another was found not guilty of the same charge with the same evidence; the test is whether as to the guilty party "the evidence is legally sufficient to support a guilty verdict as to the count of conviction." *United States v. Hernández* 146 F.3d 30, 33 (1st Cir., 1998).

After the Court ruled as to the pending Rule 29 motions (Docket No. 1339) the Circuit Court decided *United States v. Figueroa–Encarnación* 343 F.3d 23. In said case, the Court tackled the issue of an inconsistent verdict, interpreting *United States v. Powell* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) and *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932). The Court citing *United States v. Alicea*, 205 F.3d 480, 484 (1st Cir., 2000) stated that "a decision that the jury verdict is internally inconsistent" is "essentially unreviewable." *Figueroa–Encarnacion*, 343 F.3d at 29 n. 3. The Court reiterated that the critical criteria is whether there is sufficient evidence to "sustain a rational verdict of guilty beyond a reasonable doubt." *Figueroa–Encarnación* 343 F.3d at 30 n. 4. As previously discussed there was sufficient evidence to convict. *See Rule 29 Opinion and Order* (Docket No. 1339) and discussion of the relevant facts as to Gutierrez in this opinion, p. 11–15 Infra.

## 1. RULE 404(b) ERRORS

Co-defendant Ariel Gutierrez alleges that this Court erred in a violation of Fed.R.Evid. 404(b) in permitting evidence on forged checks and a check kiting scheme. The alleged errors are evidentia-

ry in nature. The Court emphasizes that the first hurdle is whether or not the matter is subject to "harmless error" analysis even if the evidence was admitted improperly. *United States v. Karas,* 950 F.2d 31, 37–38 (1st Cir., 1991); *United States v. Williams,* 985 F.2d 634, 638 (1st Cir., 1993); *United States v. Zanghi,* 189 F.3d 71, 83 (1st Cir., 1999). The Court stresses that there was plenty of evidence of guilt as to all charges, this case being one of overwhelming evidence of guilt, proven by the tracing of the moneys from one loan utilized for purposes of paying interest and/or principal of other unrelated loans. There was, further, plenty of evidence of advance payments and/or special treatment for the Gutierrez's loans as well as payments for construction work not duly completed.

As to the merits of the conduct as to forged checks and/or check kiting errors, the Court is of the opinion that the error was not committed. The Court briefly explains.

As to the checking kiting matter this evidence constitutes potential 404(b) evidence. The Court understands that the evidence was admissible as it showed yet another consideration of preferential treatment, showing a "pattern of conduct" of the bank defendant toward Gutierrez's construction corporations in allowing a check kiting scheme. As to the alleged forged checks, that conduct is not 404(b) evidence, but an overact in furtherance of the conspiracy. See *United States v. Soto–Beniquez,* 356 F.3d 1, 31–33 (1st Cir., 2004). The cashed checks proved, at the very least, that checks were issued by the bank related to refinanced Gutierrez's loans (Dow phases/ Domínguez–Wolf/Burns/Santiago and Montilla refinanced construction loans) under loans covered by the indictment, (all post October 12, 1984), and that checks were cashed favoring Modules without proper verification of the signatures. The purpose was all in furtherance of the conspiracy to use moneys of one loan to pay principal and/or interest of another past unrelated Modules loans.

## 2. CRIMINALIZATION OF THE CIVIL DISPUTES

Co-defendant, Ariel Gutierrez alleges that co-defendants have suffered from undue criminalization of civil /business disputes under the case of *United States v. Brown,* 79 F.3d 1550 (11th Cir., 1996). The Court strongly disagrees there is plenty of evidence of payments to the Gutierrez through false certificates of work performed signed by co-defendants Gutierrez and Umpierre. Entire housing projects were paid, advances were made, yet no unit or very few units were actually constructed in the individual projects subject of the disbursed moneys.

Co-defendants also aver that error was committed by the Court in allowing evidence as to criminalization of civil and regulatory evidence. Again this matter is subject to harmless error analysis. The evidence as to criminal violations was abundant. At the very least admittance of evidence of civil regulatory and civil violations was within the bounds of *United States v. Stefan,* 784 F.2d 1093 (11th Cir., cert denied, 479 U.S. 855, 107 S.Ct. 193, 93 L.Ed.2d 125 (1986))(showing required intent to violate criminal law.)

### Reckless Disregard Instruction—Bank Fraud Instruction–Entrapment by Estoppel

Defendant alleges that the court should have provided more than a "reckless disregard" instruction as to Counts 5–8 (Misapplication counts). However, "[i]t is well established that reckless disregard by a bank official of his bank's interest is sufficient to establish the requisite intent to defraud." *United States v. Cyr,* 712

F.2d 729, 732 (1st Cir.1983). Defendants second contention is that the "reckless disregard" instruction was improper to an outsider. The court accepts that co-defendant Ariel Gutierrez could not have violated § 656 as a principal (he is not a bank official); however his violation lies in aiding and abetting in the misapplication counts. (See generally Opinion and Order, D. 1339, p. 51–52).

█ As to the bank fraud instruction, co-defendant Ariel Gutierrez insists that intent to harm is a necessary element as to bank fraud. However, the First Circuit in *United States v. Kenrick*, 221 F.3d 19 (1st Cir.2000) held that "the intent element of bank fraud ... is an intent to deceive the bank in order to obtain from it money or other property. **Intent to harm is not required.**" (Emphasis ours.) Defendant's allegation lacks any merit in the domain within the First Circuit.

█ Defendant Ariel Gutierrez also alleges that an entrapment by estoppel argument should have been provided. This instruction was not provided simply because there was no evidence that the regulators knew throughout the entire period of the conspiracy of defendant's illegal conduct. The conduct having been accepted at the end of the long conspiracy. See generally Opinion and Order, D. 1339, p, 53–54.

### Alleged Brady Violations

Defendant Ariel Gutierrez alleges Brady violations as a potential error. This matter has been litigated ad nauseam. The court stands by its ruling made as to Rule 29 issues at Docket 1339. For the reader's convenience the matter is reiterated herein in its entirety.

### BRADY VIOLATIONS[34]

With regard to the alleged *Brady* violations submitted by Defendant Ariel Gutierrez, the Court supports the many previous decisions in this case regarding the matter. Defendant points to *Brady* violation emerging in November 1999 and August 2000.

The Defendant further insists that such Brady problems persisted throughout trial.

On August 25, 2000 the Court issued an order (Docket No. 724) denying Defendant's renewed Motion for *Brady* /Rule 19 Production and Alternatively Motion to Dismiss for Government Misconduct (Docket No. 624). In doing so, the Court recounted the Government's obligation established under *Brady* and reiterated that "the test is whether defendants' counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendants' case." *United States v. Ingraldi*, 793 F.2d 408, 411–412 (1st Cir.1986). Because the alleged delayed *Brady* information was produced in November 1999 and the trial was set to begin in August/September 2000, the Court ruled that no adverse effect was proven by the Defendants. (The trial itself did not actually begin until Janu-

---

**34.** The Court has issued several orders regarding alleged *Brady/Giglio* and other [discovery related] production violations. *See* Amended Order of March 12, 2002 (Docket No. 1194) (Denying Defendant's Motion for Dismissal on *Brady* violation); Order of May 14, 2001 (Docket No. 942) (Denying motion to dismiss on late *Brady* disclosure); Order of December 29, 2002 (Docket No. 844) (Denying Rule 16 Motion, ordering government compliance with *Brady* ); Sealed Order of August 20, 2001 (Docket No. 1010) (Denying the Gutierrez Defendants' Informative Motion on Delayed Production of OTS Records (Docket No. 887); Order of August 25, 2000 (Docket No. 724) (Denying request for dismissal for *Brady* /Rule 16 violations); Order of June 21, 1999 (Docket No. 572) (Denying Defendant Munoz' request (Docket No. 498) for production of a series of documents).

ary 2001.) As a direct result, the Court denied Defendant's motion.

The Defendant now renews the previous *Brady* arguments and asks this court to reconsider the various orders regarding this matter. The Court is still unconvinced that sufficient delays on the part of the government with regard to *Brady* disclosures have resulted in any prejudice to Defendants whatsoever. Certainly, up to the start of trial, there is no evidence that Defendants were prevented from using the disclosed material effectively in the presentation of their case. This is especially true due to the fact that the trial had yet to begin. The Court stands by its earlier order (Docket No. 724) regarding the allegedly late production of *Brady* material in November of 1999.

Furthermore, the Court stands by the previous rulings on this matter included in Docket Nos. 572, 844, 942, 1010, and 1194. There is exists no convincing rationale for reconsideration of these multitudinous orders. The Court's position has been repeatedly enunciated and is quite clear at this point in time. The Court understands Defendants' desire to preserve their respective objections which have arisen throughout the course of trial; however, reiteration of the Court's position at this point would be duplicitous and unnecessary. As a result, the Court denies Defendant's request for reconsideration of *Brady/Giglio* and Rule 16 violations and affirms the previous rulings of this Court.

Prejudicial pre-trial delay as well as Sixth Amendment Speedy Trial has been alleged as a potential error constituting a "close" matter at law. The matter was the subject of two Report and Recommendations, D. 507 and 493, and two Opinion and Orders, D. 579 and 750, the last published at *United States v. Lorenzo–Muñoz et al.*, 112 F.Supp.2d 204 (D.P.R.2000). The court refers the reader to these dockets.

The matter is not close as to Sixth Amendment Speedy Trial and/or pre-trial delay for the reasons set forth at *United States v. Lorenzo–Muñoz, Id.*

■ Prejudicial pre-trial publicity was also alleged as an error constituting a close question of law. The matter was referred to the Magistrate Judge and the Report and Recommendation of the Magistrate Judge recommended a denial of the request (D.493). Although defendant Ariel Gutierrez disagreed with the conclusion of the R & R "that there has been no prejudice to the Gutierrez defendants in their ability to present their case to a jury", the Gutierrez defendants agreed with the report of the Magistrate Judge's note that "the issue will be clarified when the jury panel is questioned through voir dire." (D.519). The Gutierrez defendants stated that they would "request leave of the court to renew the motion during jury selection." Since no specific portion of the R & R was questioned, the matter was to be reviewed only for plain error. The court found none, (D.570), and stated that the voir dire of the potential jurors would subsequently be tailored to the pre-trial publicity which the case received and to secure the fair and impartial jury that the Sixth Amendment to the Constitution requires. *United States v. Cardona*, 705 F.Supp. 70, 72 (D.P.R.1989).

The court proceeded to jury selection thereafter beginning on November 28, 1999, during four days a week for three weeks. See D. 838, 839, 840 for a total of eleven days. The court performed individual jury voir dire, each juror was questioned away from the reminder of the jury panel to avoid potential contamination of the entire panel. Three panels consisting of over eighty (80) jurors each were individually questioned. The selected jurors were eventually sworn in. No objection was lodged as to any juror and the court

reviewing the record has found no motion filed thereafter as to prejudicial publicity prior to swearing of the jury on January 24, 2001. This matter is, therefore, waived and no "close" issue of law is present pursuant to the holding of *United States v. Bayko*, 774 F.2d at 521–522.

### Mega Trial and Prejudicial Delay in Flow of the Trial

This alleged error is covered at the Opinion and Order of the court as to Rule 29, (D.1339), at p. 60–70. The court concluded that there was no repetitive evidence involving twelve (12) Gutierrez' construction projects and fourteen (14) construction projects of Mirandes all within a ten year period. The trial consisted of one hundred and sixty eight days (D. 1339, p. 61 n. 51). Most of the delays were either stipulated for just cause, or at the request of the witnesses and/or the jurors.[35] The work week was limited to Mondays through Thursday at the request of Continental counsel of the defense team, (D. 1339, p. 62 # 14). The jury subsequently requested to work on Fridays. The defense team balked at the suggestion, (D. 1339, p. 61 n. 51). (See breakdown of the witnesses testimonial days and specific topics covered of testimony by the principal witnesses, including defense witnesses, (D. 1339 p. 65–70).

Defendant took three days to present to the court their Rule 29 motions, (D.1210, 1222, 1224), and requested a four day recess thereafter to begin their case, (D. 1339 p. 68–70). Arguments of a Mega trial and/or delay in the flow of the case are, therefore, not close within the *Bayko* standard.

### Prosecutorial Misconduct

Defendants have alleged two types of misconduct, (a) specific comments at closing, (b) trial misconduct. The court addressed these issues at the Rule 29 Opinion and Order (D.1339, p. 47–48). The court reproduces the resolution of this matter.

### A. SPECIFIC COMMENTS AT CLOSING[36]

Defendants Ariel Gutierrez and Munoz–Franco have objected to the government's conduct during closing arguments in their respective Rule 29 Motions (Dockets No. 1300 and 1307). Defendants charge that the prosecutions actions constituted "inflammatory and false comments," and were "intended to create confusion and to divert the jury's attention from the lack of evidence to convict."[37] Docket No. 1300 p. 6; Docket No. 1307 p. 16.

35. The parties originally informed the jurors and the court that the case would last at most four months. Consequently the court authorized the jury members to make arrangements for vacations in the months of July/August considering that trial commenced in January. Hence, the court was forced, at the end of summer, to allow jurors to take their pre-paid vacations. Subsequently, the jury was advised that the case would definitely finish by Christmas. But the case was not over by then. Unfortunately, two of co-defendants' counsels became seriously ill, one requiring non elective complicated surgery, another had a heart ailment. The Christmas vacation was hence extended. Further, the court stopped the trial for almost two weeks in May/June because of graduations of jurors family members.

36. The Court notes that a review of Defendants' argument is more appropriate for appellate purposes as the Court has already considered this issue. Nonetheless, the Court shall briefly consider Defendants' position.

37. The government points to one of the defense counsel's closings in which tears were shed before the jury, by the defense counsel himself. While the behavior of defense counsel may have been extremely uncalled for and inappropriate, the Court simply reflects on the Defendants' allegations.

The Court permitted the prosecution to proceed with their closing and found no evidence of unfair prejudice in doing so. At the time of the closing arguments, the Court [did not] evaluate any of the prosecution's behavior as inappropriate or improper. Months later, and without specific reference to any particular statement, the Court affirms its previous holding on the matter. The Defendants' position shall be noted, but the Court shall not acquit the charges on these grounds.

## B. OTHER TRIAL CONDUCT[38]

During the course of this case, Defendants have put forth motions to dismiss for prosecutorial misconduct on at least six occasions. Each time, the Court has denied the request. Now, at the end of trial, Defendants continue to allege that the government acted in such as fashion as to constitute prosecutorial misconduct necessitating dismissal of this case. The Court is cognizant of Defendant's desire to preserve said objection; however, the prudence in rehashing the Court's myriad rulings is questionable at best.

As early as August 31, 1999, this Court denied Defendants' motion for dismissal to due prosecutorial misconduct. As recently as March 13, 2002, this Court once again denied Defendants' motion for dismissal for prosecutorial misconduct. *Rather than address the same issue again, the Court simply points Defendants to the previous rulings in Dockets No. 588, 724, 1010, 1186, 1196, and 1266; reaffirming denial of Defendant's motion to dismiss for prosecutorial misconduct.* At no point has the prosecution's conduct been so "outrageous," "most appalling and egregious," and "shocking to the sense of justice" as to require dismissal of this case. Such a "potent elixir should not be casually dispensed," and shall not be dispensed by this Court at this time. *United States v. Santana,* 6 F.3d 1, 10 (1st Cir.1993). (D.1339, p.47–49.)

 Finally, defendant Ariel Gutierrez argues that the court imposed improper cross-examination limitation. The court disagrees since the court then considered that defendant was specifically attempting to impeach on a collateral issue. *United States v. Beauchamp,* 986 F.2d 1, 3–4 (1st Cir.1993) ("It is well established that a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral matter ... A matter is considered collateral if the matter itself is not relevant in the litigation to establish a fact of consequence.")

The reminder of the issues brought forth by co-defendant Ariel Gutierrez have already been covered or are either unpersuasive or constitute issues handled in a "perfunctory manner," unaccompanied by some developed argumentation and are hence deemed to have been abandoned. *Ryan v. Royal Insurance Co. of America,* 916 F.2d 731, 734 (1st Cir.1990); *United*

---

**38.** The Court has issued at least six orders denying dismissal for alleged government misconduct. *See* Opinion and Order of May 6, 2002 (Docket No. 1266) (Denying Defendant's motions to dismiss for prosecutorial misconduct (Docket Nos. 1223 & 1225)); Order of March 13, 2002 (Docket No. 1196) (Denying Defendant's Renewed Motion Requesting Dismissal for the Government's Misrepresentation); Order of March 4, 2002 (Docket No. 1189) (Denying request of dismissal for prosecutorial misconduct); Sealed Order of August 20, 2001 (Docket No. 1010) (Denying Defendants' motion regarding government's cumulative and leading questions and incompleteness of evidence presented (Docket Nos. 886, 878)); Opinion and Order of August 25, 2000 (Docket No. 724) (Denying request of dismissal for prosecutorial misconduct); Opinion and Order of August 31, 1999 (Docket No. 588) (Denying Defendants' motion to dismiss due to prosecutorial conduct (Docket No. 424)).

States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990); Martinez v. Colón, 54 F.3d 980, 990 (1st Cir.1995).

### D. Lorenzo Muñoz–Franco

Defendant Lorenzo Muñoz–Franco has also filed various motions requesting bail on Appeal.[39]

Defendant basically alleges the correct standard in that defendant must raise "a substantial question of law or fact" meaning a "close" question of law or fact. United States v. Bayko, 774 F.2d at 522–523. (See D. 1536, p. 2–3.) At Docket 1535 defendant alleges various issues on appeal. The court has already discussed many of them in this Opinion and Order.

Co-defendant Muñoz–Franco joins other co-defendants as to the failure of the court to have the jury determine the amount of the loss under Blakely v. Washington, 542 U.S.——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). However, the defendants never requested the court for the jury to determine the loss at the sentencing phase nor during trial. Further, co-defendant Ariel Gutierrez requested, without any other co-defendant objecting, that all language as to loss be redacted from the indictment sent to the jury for deliberation (D. 1524 p. 104). Moreover, all parties agreed that no argument be made as to loss in the closing arguments because the court would decide the matter at sentencing. As the matter was not submitted to the jury as stated above, the court is faced with a clear case of review only for plain error. United States v. Savarese, 385 F.3d at 21 (2004). ("The appellant did not raise the jury trial issue in the district court, nor did he re-

quest a jury trial with respect to factual issues as to the sentencing. Thus, we review the district courts enhancements ... for plain error.") See also, United States v. Duncan, 381 F.3d at 1073; United ed States v. Ameline, 376 F.3d 967, 978 (9th Cir.2004). See generally United States v. Cotton, 535 U.S. at 631, 122 S.Ct. at 1781 (2002); ("holding that an Apprendi violation case be considered under plain error analysis" as quoted in United States v. Savarese, Id.). Hence, the motion under Blakely and also under United States v. Booker and United States v. Fanfan, 543 U.S. ——, 125 S.Ct. 738, —— L.Ed.2d —— (2005) (Booker analysis subject to plain error test under ordinary prudential doctrine analysis).[40]

The court has already concluded in this Opinion that the losses on the record by far justify the sentence imposed by the court (losses as to Mirandes and Gutierrez loans exceeded the cap of the Guidelines of November 1, 1987 set at $5 million dollars); hence, there is no plain error. Further, at this Opinion and Order, at Docket 1339, the court has concluded that there is sufficient evidence on the record to satisfy all elements of all counts of the indictment. Moreover, the record fully justifies that as President of the Bank he was in a position of trust and that the violations were performed with more than minimal planning. (Sophisticated plan developed through a long period of time to disguise from the regulators and Bank's directors the precarious economic position of debtors Gutierrez and Mirandes and at the same time disguise the losses the bank had to consequentially accept.)

---

**39.** D. 1535 Motion for Release Pending Appeal; D. 1593 ... Reply to Opposition ...; D.1597 Leave to File a Reply; D. 1606 Motion to Reopen Sentencing; D. 1616 Informative Motion.

**40.** "Nor do we believe that every appeal will lead to a new sentencing hearing. This is

because we expect reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the plain error test." United States v. Fanfan, Id. (Opinion of the court entered by Justice Breyer.)

Co-defendant, Muñoz–Franco, further alleges that there was an error in the admission of Ex. 40 (the valuation of the loss of the Bank). Defendant Muñoz–Franco alleges that the error constitutes a confrontation clause error under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The problem is that Ex. 40 was an Exhibit **as to losses** and losses were not subject of the verdict. Further, the entire subject of losses did not affect liability since the bank fraud instruction did not have losses as an element (D. 1278, Instruction No. 19). No instruction was provided to the jury as to "actual" or "intended" loss. Furthermore, the parties were instructed not to discuss losses in the closing arguments because the loss calculation was to be made later by the court. Finally, at the request of co-defendant Ariel Gutierrez the indictment that went to the jury deliberating room, at the request of counsel Pasano, was redacted by the removal of all "loss" language, (D.1524, p. 104).

As stated before the court conservatively found as to him a loss $20 million dollars which is a high number anyway. Hence, any error as to the admission of Ex. 40, constitutes " harmless error." *United States v. Casas*, 356 F.3d 104, 121 (1st Cir.2004) ("The admission of improper testimony is harmless if it is highly probable that the error did not influence the verdict ... [calling for] a panoramic case [analysis], specific inquiry considering among other things, the centrality of the tainted material; its prejudicial impact; the uses to which it was put during trial; the relative strength of the parties cases; and any telltales that furnishes clues to the likelihood that the error affected the fact finder resolution of a material issue.") These factors clearly point to no repercussion as to the finding of guilt since the "losses" were outside the calculous of liability, and this case is not one of "scarcity of evidence" but of "overwhelming evidence of guilt" as to bank fraud (see *United States v. Aguilar–Aranceta*, 58 F.3d at 802), established by documentary evidence, checks moving from one loan to another unrelated loan and fraudulent payments to Gutierrez and Mirandes corporations for construction work not performed. The net result is that the argument founded on Ex. 40, which even the court did not use at sentencing, fails to reach the required threshold of *United States v. Bayko*, 774 F.2d at 522–523.[41]

**41.** Co-defendant Lorenzo Muñoz–Franco made also an argument as to Ex. 40 based on FIRREA (Financial Institution Reform Recovery and Enforcement Act of 1989) and the case of *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The court faced that issue at Docket No. 1520 order as to Downward Departure request. The court then stated:

Counsel Cinquagrana further made a downward departure request based on the case of *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). *Winstar* basically stands for the proposition that losses caused by statutory or regulatory changes, in this case FIRREA, creating new accounting procedures thereby causing losses, said losses cannot be attributed to defendants because they resulted from the government's own acts. The theory expressed is that a substantial amount of losses occurred because new accounting methods were established which eliminated special accounting treatment authorized prior thereto by regulation for the bank's prior acquisition of other failing thrifts. However, the Module Construction Loan and/or the Mirandes' Construction Loans were not loans originally granted by the Caguas Acquisition of the Federal Supervisory or by the Home Federal. These loans were all original loans granted by Caguas Federal. Further, the loan losses were not related to change in accounting procedures. The loans suffered losses because of the conduct of defendants. The loans failed because the underlying construction project could not generate sufficient cash because in part cash was taken out of the loan to pay other prior construction loans and other personal loans

The defendant alleges error by the admission evidence prior to the enactment of the bank fraud statute on October 12, 1984. The court has already discussed this matter at p. 36–37, 44–45 of this Opinion and Order.

■ The co-defendant further alleges an error by the court in denying the downward departures requested. The court clearly understood the request, understood that it had authority to deny or grant the request and ultimately denied all downward requests. (See D. 1520). The downward requests are thus unreviewable. *United States v. Gendrau*, 337 F.3d 70, 72 (1st Cir.2003).

Pre-trial delay admittance of evidence as to forged checks, prosecutorial misconduct, insufficiency of evidence, and jury deliberation note, have also been alleged as constituting "close" questions of law warranting bail on appeal. All these issues have been entertained in this Opinion and Order; the court strongly disagrees that these matters constitute a "close" question as stated infra.

■ Further, based on *United States v. Ralph Casas, et al.*, 356 F.3d 104, 117–124 (1st Cir.2004) and *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), co-defendant Muñoz–Franco alleges error in the admission of testimony provided by Victor Kareh, the principal Executive Supervisor of the Construction Loan Department at the Caguas Bank throughout the conspiracy.[42] His supervisor was the Senior Vice-president of the Bank, Dr. Francisco Sánchez–Aran. He testified in court during direct and cross examination for thirty-two days.[43] He testified as to bank checks to Gutierrez and Mirandes corporations which he signed, or originally refused to sign, construction loan and loan documents which were under his direct supervision or which he signed and ledger cards which he handled and/or supervised. The bank documents were admitted into evidence under Fed. R. of Evid. 803(6). (Business records kept in the regular course of business.) He traced checks paid to Modules corporations related to a particular construction project and showed through ledger cards of other construction loans that proved

---

of the debtors. Fraudulent activity was being carried on by direct acts of the defendants causing the loans to fail as described in the Amended Sentencing Opinion and Order of February 27, 2004, Docket No. 1517. Further, the expert of defendants accepted that FIRREA was not the cause of the failure of Caguas Federal. D. 1520, p. 4–5.

It is evident that the law being [enacted in] 1989, all the losses had already [occurred], the Denby letter had been issued and all the refinancing of failed loans had already occurred [refinanced loans occurred in late 1984 to 1986]. Hence, FIRREA is not a factor as admitted by defendants own expert witness. (Testimony of Angelo Vigna, former President of Federal Loan Bank of New York, Testimony 4/17/02, p. 111–114.) See, further, analysis as to the FIRREA Exhibit at D. 1339, p. 72 ("The court is convinced that the government was able to adequately present evidence that FIRREA

was not the cause of [the] Caguas [Bank] collapse, but that the real estate documents, procedures, and loans of the bank and the defendants [actions] were the true grounds for [the] demise of Caguas.")

The court also considered FIRREA in the context of defendants Ex Post Facto Argument. See Order of August 31, 1999. (Docket No. 586.)

42. At Docket 1339, p. 64–70 the court summarized the testimony of each witness for the government and the defendants.

43. Most of the witness testified in Spanish requiring the question to be asked in English, a translation to the witness, an answer provided in Spanish and a translation into the record in English. When trials have mostly witnesses testifying in Spanish requiring translations they tend to be of longer duration.

that the money was not invested in the original construction project but to pay principal and interest in other prior unrelated loans. He testified as to every payment made from one loan to another on each of the Gutierrez and Mirandes' loans. He also testified as to ultra vires payments made for certificates of construction for work not actually performed. He refused to pay the certificates unless his supervisor approved them in writing (non complying certificates of construction were presented into evidence). He also testified as to payments related to a particular construction loan to be used in that particular construction loan but used in another construction loan. This testimony was provided using checks paid by the bank to Modules or to Mirandes corporations and substituted by other checks and used to satisfy other obligations in another unrelated loan also of Caguas.

This testimony was hardly the testimony of the *United States v. Ralph Casas*, 356 F.3d at 117, 124, wherein a government agent testified not only about "admissible evidence based on his personal knowledge of observed events", *United States v. Casas et al.*, 356 F.3d at 117 but also "about what he was told in post arrest statements from individuals who, because they had been arrested, were no longer part of the conspiracy." *United States v. Casas*, Id. P. 118. The agents testimony was also hearsay based on persons who later "did not testify" Id. The critical inadmissible testimony of the government agent as to hearsay was never cured by subsequent testimony.

Contrariwise, in the testimony of Kareh the movement of the moneys from one loan to another loan can be verified by documentary evidence. Any potential hearsay testimony for example as to "authorization of the construction certificates", D. 1339 p. 65, was provided by

Vice-president Anabel Enriquez as to those certificates not signed by Sánchez Aran but approved by him. "Ms Enriquez also testified as to the practice (later admitted) of using loan proceeds of a construction project to pay unrelated prior construction projects." (D.1339, Id.) Under the above scenario there was no error and any potential error pursuant to the case of *United States v. Casas*, 356 F.3d at 121 is subject to "harmless error." Again the court emphasizes that this case is not one of "scarcity of evidence" but one of "overwhelming evidence" of guilt under *United States v. Aranceta*, 58 F.3d at 802. The matter fails to be a "close" question of law under *Bayko* analysis.

Finally, under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), co-defendant insists that there is prejudicial error in admitting Ex. 40. All evidence admitted is subject to harmless error analysis, under "a panoramic view." *United States v. Casas*, 356 F.3d at 121. See discussion at p. 36–37; 44–45 of this Opinion and Order.

Briefly restating the document, (Ex. 40), is objected because it inflamed the jury as to the amount of loss. But the court did not provide a loss requirement in the elements as to bank fraud. The elements as to bank fraud liability failed to require any loss. The court did not provide any instruction as to "intended loss" nor "actual loss." Further, all parties agreed not to discuss loss because the court would decide loss at the sentencing hearing. No party argued loss to the jury in the three days of oral arguments. The jury was not required in any special instruction to determine losses. Finally, one of the counsel of defendants requested that all language as to losses in the indictment that went to the jury deliberation room be expunged. The legal issue is therefore not "close" and fails the *Bayko* requirement, 774 F.2d at 522.[44]

---

**44.** Co-defendants Muñoz–Franco and Sán- chez–Aran also allege error, (D. 1433 and

## CONCLUSION

The court having examined individually the requests made by all co-defendants, the court denies the request for bail under appeal pursuant to the statutory requirement under 18 U.S.C. 1343 not because the co-defendants are a danger to society or likely to fee but because they fail in the third requirement, that is, that the issues presented in the opinion of the court fail to reach the required threshold of a "close" question of fact or law under *United States v. Bayko*, 774 F.2d at 522–523.

**The co-defendants Lorenzo Muñoz–Franco, Francisco Sánchez–Aran, Wilfredo Umpierre, and Ariel Gutierrez Rodríguez are, therefore, to report to the Marshals Office or their designated institution by FEBRUARY 28th, 2005, AT 10:00 A.M.**

**IT IS SO ORDERED.**

1439), in that the case should be dismissed because this case contains the same nucleus of operative facts adjudicated in the Bank's favor in the case of *Resolution Trust Corpora-* *tion v. Reliance Insurance Company,* Civil # 93–1006(JAF). The matter was resolved by the court at D. 1442. The court stands by said resolution dated December 12, 2002.